**XPEDIOR CREDITOR TRUST, on behalf of itself and others similarly situated, Plaintiff,**

v.

**CREDIT SUISSE FIRST BOSTON (USA) INC., as successor-in-interest to Donaldson, Lufkin & Jenrette Securities Corporation, Defendant.**

No. 02 Civ.9149(SAS).

United States District Court, S.D. New York.

March 9, 2004.

Steven J. Toll, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, D.C., for Plaintiff.

H. Laddie Montague, Jr., Lawrence J. Lederer, Charles Goodwin, Jennifer E. MacNaughton–Wong, Berger & Montague,

P.C., Philadelphia, Pennsylvania, for Plaintiff.

Linda P. Nussbaum, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., New York, New York, for Plaintiff.

Peter K. Vigeland, Wilmer, Cutler & Pickering, New York, New York, for Defendant.

Sam J. Salario, Jr., Carlton Fields, Tampa, Florida, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

The Securities Litigation Uniform Standards Act of 1998 ("SLUSA")[1] preempts certain class actions that allege misrepresentations, omissions, or other fraudulent schemes in connection with the purchase or sale of covered securities. Under SLUSA, regardless of the words used by a plaintiff in framing her allegations and regardless of the labels she pastes on each cause of action, a court must determine whether fraud is a *necessary component* of the claim. Under this test, a complaint is preempted under SLUSA when it asserts (1) an explicit claim of fraud or misrepresentation (*e.g.*, common law fraud, negligent misrepresentations, or fraudulent inducement), or (2) other garden-variety state law claims that "sound in fraud." Defendants move to dismiss the instant complaint based on SLUSA preemption. Because neither misrepresentations nor a scheme to defraud are a necessary component of plaintiff's claims, the preemption motion is denied.

The Xpedior Creditor Trust[2] is suing Credit Suisse First Boston (USA), Inc.

---

1. Pub.L. No. 105–553, 112 Stat. 3227 (codified at 15 U.S.C. §§ 77p, 78bb(f)).

2. On April 20, 2002, Xpedior, Inc. and certain of its subsidiaries filed voluntary bankruptcy petitions under Chapter 11 of the United States Code in the United States Bankruptcy Court for the Northern District of Illinois. On March 27, 2002, the Bankruptcy Court confirmed Xpedior's Plan of Liquidation, pur-

("CSFB"), as successor-in-interest to Donaldson, Lufkin & Jenrette Securities Corp. ("DLJ"),[3] on behalf of companies that issued securities in initial public offerings ("IPOs") underwritten by DLJ. The kernel of Xpedior's suit is that DLJ capitalized on the underpricing of the IPO and thereby violated the express and implied terms of the parties' underwriting agreement, including DLJ's duty of good faith and fair dealing and its duty as Xpedior's fiduciary. Xpedior also claims that DLJ was unjustly enriched.

CSFB now moves to dismiss the Complaint, arguing that Xpedior's claims are preempted by SLUSA, and otherwise fail as a matter of law. For the reasons that follow, with one exception, CSFB's motion is denied.

## I. BACKGROUND [4]

Although the two cases are not related, the allegations in this case closely mirror those in *MDCM Holdings, Inc. v. Credit Suisse First Boston Corp.*,[5] familiarity with which is assumed. In brief, Xpedior, in an effort to raise new capital, decided to go public in 1999. DLJ agreed to underwrite the offering.

Pursuant to an underwriting agreement dated December 16, 1999, Xpedior sold 8,535,000 shares of its common stock to DLJ and other members of the underwriting syndicate for $17.67 per share.[6] DLJ and the other syndicate members also exercised an option to acquire an additional 1,280,250 shares at the same price.[7] DLJ, in turn, sold these shares to the public at $19.00 per share – an "underwriting spread" of 7% – netting DLJ a total of $13,054,282.00 in underwriting commission.[8] Xpedior raised approximately $173.4 million in the IPO.[9] Xpedior's stock was registered with the Securities Exchange Commission and, starting on the day of the IPO, commenced trading on the NASDAQ National Market under the ticker symbol "XPDR." [10]

At the end of its first day of trading, Xpedior stock closed at $26.00 per share, or approximately 37% above the original $19.00 per share offering price.[11] Xpedior's IPO was thus typical of other IPOs underwritten by DLJ at this time. For example, the DLJ-underwritten IPOs in MarketWatch.com, Akamai Technologies, and Free Markets experienced a more than 450% increase in price on their first day of trading.[12] "Indeed, data published by Professor Jay Ritter of the University of Florida notes that the 10 biggest first-day IPO percentage increases in history all took place within the Class Period herein." [13] Of the ten IPOs cited, DLJ partici-

---

suant to which Xpedior and its subsidiaries transferred all of their assets, including all causes of action asserted in this case, to the Xpedior Creditor Trust. *See* Complaint ("Compl.") ¶ 7. Accordingly, throughout this Opinion, I use the term "Xpedior" to refer to both Xpedior, Inc. and the Xpedior Creditor Trust.

3. CSFB and DLJ merged in 2000. *See id.* ¶ 9.

4. Xpedior's complaint is styled as a class action, but there is no need here to summarize the allegations regarding suitability for class certification.

5. 216 F.Supp.2d 251 (S.D.N.Y.2002).

6. *See* Compl. ¶ 25.

7. *See id.*

8. *See id.*

9. *See id.*

10. *See id.*

11. *See id.* ¶ 26.

12. *See id.* ¶ 27.

13. *See id.* ¶ 28.

pated as lead underwriter in three, and as a syndicate member in one other.[14]

Xpedior complains that DLJ used the "irrational exuberance" of the late '90s tech market to enrich itself by requiring customers who sought to purchase IPO shares to pay it the offering price plus, directly or indirectly, a share of profits that the customers realized.[15] "These payments frequently took the form of direct sharing in their clients' profits who quickly sold (or 'flipped') the particular IPO stock at issue to other investors in the aftermarket; increased or excessive trading commissions paid by the favored clients in connection with the IPO stock and/or on other securities transactions; commitments for future IPO and/or other new securities trading business; and other similar arrangements to benefit DLJ." [16] In addition, Xpedior alleges that DLJ took advantage of the "underpricing environment" in which the IPO took place by implementing allocation and compensation practices that relied on a precipitous increase in the value of the IPO shares once issued to the public.[17] Xpedior asserts four claims arising from this conduct.

Count I of the Complaint alleges that DLJ breached the explicit terms of the underwriting agreement in three ways. *First,* DLJ did not sell the IPO shares to the public as the contract requires, but instead directed shares to favored customers.[18] *Second,* DLJ did not sell the IPO shares for the price provided in the prospectus, but instead required purchasers to pay a higher price.[19] *Third,* DLJ, by virtue of its allocation and profit-sharing practices, was over-compensated for its underwriting services in violation of the fixed "underwriting spread" provided in the agreement.[20]

Count II alleges that DLJ violated implied covenants of good faith and faith dealing that accompanied its performance of the underwriting agreement.[21] DLJ allegedly violated these covenants by taking advantage of the underpriced IPO shares so that it could allocate those shares to favored clients and receive additional compensation in return.[22] As a result, Xpedior received deficient and overpriced underwriting services and was unable to maximize its profits from the IPO.[23]

Count III alleges that DLJ owed fiduciary duties of loyalty, due care and fair dealing to Xpedior.[24] These duties arose because DLJ was the underwriter for the IPO and had superior knowledge and expertise, was in receipt of confidential information, and acted as an agent and advisor to the issuer.[25] According to the Complaint, DLJ violated these duties by allocating shares to favored customers and sharing in the profits made by those customers.[26]

Count IV, brought in the alternative to

14. *See id.*

15. *See id.* ¶ 1.

16. *Id.* ¶ 29.

17. *Id.* ¶ 30.

18. *See id.* ¶ 39.

19. *See id.* ¶¶ 36–38.

20. *See id.* ¶¶ 37–40.

21. *See id.* ¶¶ 46–50.

22. *See id.* ¶¶ 47–49.

23. *See id.* ¶¶ 49–50.

24. *See id.* ¶¶ 51–55.

25. *See id.* ¶ 52.

26. *See id.* ¶ 54.

Counts I through III,[27] asserts a claim of unjust enrichment and restitution against DLJ on the ground that Xpedior "conferred benefits upon DLJ in connection with [its] IPO[ ] which, in the circumstances ... would be inequitable for Defendant to retain."[28] Count IV further alleges that the profit-sharing compensation from favored customers unjustly enriched DLJ.[29]

CSFB now moves to dismiss the Complaint.

## II. LEGAL STANDARD

"Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint *only* if it is clear that no relief could be granted under *any* set of facts that could be proved consistent with the allegations.' "[30] Thus, a plaintiff need only plead " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."[31]

At the motion to dismiss stage, the issue " 'is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test.' "[32]

The task of the court in ruling on a Rule 12(b)(6) motion is " 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' "[33] When deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor.[34]

## III. DISCUSSION

### A. SLUSA

#### 1. The Statutory Framework

 In 1998, Congress enacted SLUSA to "prevent plaintiffs from seeking to evade the protections that Federal law provides against abusive litigation by filing suit in State court, rather than Federal court."[35] The purpose of SLUSA is to ensure that securities fraud cases are heard only in federal courts and only under federal law. The Act provides in relevant part:

> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained

---

27. *See id.* ¶ 59.

28. *See id.*

29. *See id.* ¶¶ 58–60.

30. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (emphasis added) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

31. *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (quoting Fed.R.Civ.P. 8(a)).

32. *Phelps v. Kapnolas*, 308 F.3d 180, 184–85 (2d Cir.2002) (per curiam) (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir.1998)).

33. *Pierce v. Marano*, No. 01 Civ. 3410, 2002 WL 1858772, at *3 (S.D.N.Y. Aug.13, 2002) (quoting *Saunders v. Coughlin*, No. 92 Civ. 4289, 1994 WL 88108, at *2 (S.D.N.Y. Mar. 15, 1994)).

34. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002).

35. *MDCM*, 216 F.Supp.2d at 256 (citing H.R.Rep. No. 105–803 (1998)). In particular, SLUSA was enacted to prevent plaintiffs from avoiding application of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77z–1 *et seq.*; 78u–4 *et seq. See MDCM*, 216 F.Supp.2d at 256.

in any State or Federal court by any private party alleging –

(A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or

(B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.[36]

CSFB argues that this suit is preempted by SLUSA and must be dismissed.

In *MDCM*, I determined that a complaint substantially the same as Xpedior's was not preempted because its common law claims – breach of contract, breach of the implied covenants of good faith and fair dealing, breach of fiduciary duty, and unjust enrichment – did not allege "a misrepresentation or omission of a material fact," as required by SLUSA.[37]

MDCM only alleges ... that Credit Suisse signed numerous contracts in which it promised to do one thing but then did another. "The failure to carry out a promise made in connection with a securities transaction is normally a breach of contract. It does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform." [38]

As was the case in *MDCM*, Xpedior has not alleged that DLJ had such an intent and, to prevail on its breach of contract claims, Xpedior need not offer any evidence about DLJ's mental state. To the contrary, Xpedior need only prove that DLJ failed to satisfy the requirements of the underwriting agreements.

**2. The Court Is Now Required to Look Beyond Plaintiff's Allegations**

CSFB argues, however, that the Court must "look[ ] beyond the explicit allegations of the complaint and the state law labels the plaintiffs employ[ ] to the 'gravamen' or 'essence' of their claims." [39] Although I rejected this argument in *MDCM*,[40] recent caselaw in this Circuit now requires such a review.

In *Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, the Second Circuit explained that "SLUSA was intended to completely preempt the field of *certain types* of securities class actions by essentially converting a state law claim into a federal claim...." [41] The court went on to explain the ramifications of finding SLUSA to be a complete preemption statute:

"Complete preemption," when triggered, provides in practice an exception to the well-pleaded complaint rule. It trumps the well-accepted principle that the plaintiff is the "master of the claim" and may avoid removal to federal court by alleging only state law claims.[42]

After *Spielman*, it is now clear that courts must probe the plaintiff's pleading to determine whether SLUSA preemption ap-

---

36. 15 U.S.C. § 78bb(f)(1). Any such class action brought in state court is removable to federal court. *See id.* § 78bb(f)(2).

37. *See MDCM*, 216 F.Supp.2d at 257–59.

38. *Id.* at 257 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir.1993)).

39. Memorandum of Law in Support of Defendant Credit Suisse First Boston (USA), Inc.'s Motion to Dismiss ("Def.Mem.") at 4.

40. *See MDCM*, 216 F.Supp.2d at 257–58.

41. 332 F.3d 116, 123 (2d Cir.2003) (emphasis in original).

42. *Id.* at 123 n. 5 (citing *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392–93, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987)).

plies. Nonetheless, the question remains as to how broad a brush a court should wield in rewriting a complaint. *Spielman* offers no guidance in this regard.

 Three recent cases, two of which are relied on by plaintiffs, may be instructive.[43] Each of these courts applied what I will call the "necessary component" test, wherein a court must determine whether the state law claim relies on misstatements or omissions as a "necessary component" of the claim. In this context, "necessary component" encompasses both technical elements of a claim as well as factual allegations intrinsic to the claim as alleged.[44] Thus, under the necessary component test, a complaint is preempted under SLUSA only when it asserts (1) an explicit claim of fraud (*e.g.,* common law fraud or fraudulent inducement), or (2) other garden-variety state law claims that "sound in fraud." [45] But SLUSA does not preempt claims "which do not have as a necessary component misrepresentation[s], untrue statements, or omissions of material facts" [46] made in connection with the purchase or sale of a security. A brief review of these three cases sheds light on the application of the test.

In *Hines v. ESC Strategic Funds, Inc.,* 1999 WL 1705503 (M.D.Tenn.1999), the earliest of the three, the court analyzed four state law claims to determine whether they were preempted by SLUSA. Those claims were denominated as: state securities fraud, common law fraud, breach of fiduciary duty, and breach of implied contract. At the outset, it is worth noting that this complaint directly alleged a fraudulent scheme in the two claims based explicitly on fraud. The court found that the breach of fiduciary duty claim was not preempted because the alleged breach of duty occurred *after* plaintiff purchased her shares. Thus, the alleged breach did not occur "in connection with" the purchase or sale of a security. The discussion of the fourth claim – breach of implied contract – is relevant to the issue presented here. Despite plaintiff's allegation that the defendants breached their implied contract at the time they terminated the fund in which plaintiff was an investor, the court found that any obligations under the implied contract arose at the time plaintiff made her investment. The court had no difficulty concluding that the plaintiff's allegations concerned action taken in connection with the purchase or sale of a security. More importantly, however, the complaint alleged that "as a result of the *representations* made to the Plaintiff Class ... defendants assumed an implied contractual obligation" not to terminate the fund for reasons of self-interest.[47] Because the representations referred to had been described as fraudulent earlier in the complaint, it required no great leap to conclude that the plaintiff was necessarily

---

**43.** *See In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d 371, 443 (S.D.N.Y.2001); *McEachern v. Equitable Life Assur. Soc. of the U.S.,* No. Civ.A. CV00–403–CB, 2001 WL 747320 (N.D.Ala. June 15, 2001); *Hines v. ESC Strategic Funds, Inc.,* No. 99–0530, 1999 WL 1705503 (M.D.Tenn. Sept. 17, 1999).

**44.** *McEachern,* 2001 WL 747320, at *2 n. 1.

**45.** *Cf. Rombach v. Chang,* 355 F.3d 164 (2d Cir.2004) (discussing the notion of claims that "sound in fraud," notwithstanding that fraud is not an essential element of those claims). Of course, a claim is only preempted if it meets the other requirements of SLUSA as well – *i.e.,* it arises in a "covered class action" and the misstatement or omission was made "in connection with" the purchase or sale of a "covered security."

**46.** *McEachern,* 2001 WL 747320, at *2 (citing *Hines,* 1999 WL 1705503).

**47.** *Hines,* 1999 WL 1705503 at *6 (emphasis added).

alleging an untrue statement or omission of a material fact.

In *McEachern v. Equitable Life Assurance Society of the United States*, the court held that in order to determine whether a claim had the "necessary components" of a material misstatement or omission in connection with the purchase or sale of a covered security it must consider the "formal elements of the claim or allegations which are particularly intrinsic to plaintiff's theory of the case."[48] Among the questions that the court asked the parties to answer to assist with that determination was whether the *"misrepresentations alleged* by plaintiff apply to the choice of a particular security...."[49] It is clear from this quotation that, at the very least, plaintiff's complaint involved allegations of certain misrepresentations made by defendants. The court went on to provide examples of when claims would *not* be preempted: when a plaintiff seeks to enforce a promise (not alleged to be fraudulent or misleading) made by a defendant at the time a security was sold, or when a transaction is not intrinsically related to the security being traded (*e.g.*, the choice of a brokerage house rather than a particular security).[50]

Finally, in *In re Livent, Inc. Noteholders Securities Litigation*, the court once again addressed a complaint that alleged four state law claims. As in *Hines*, this complaint explicitly alleged fraud in three of the state law claims – fraud, negligence and negligent misrepresentation. Not surprisingly, the court found that each of these were preempted as they were plainly "grounded on" alleged misstatements.[51] Once again, it is the fourth claim that is of interest here. Plaintiffs' fourth state law claim was for tortious interference with contract. In short, that claim alleged that in order to avoid the benefits of a change-of-control clause in a Trust Indenture agreement that turned on whether certain executives were still employees, the "defendants *schemed* to demote and suspend [the executives] rather than discharge them...."[52] In determining whether the claim was preempted the court asked "whether [the] personnel decisions ... constituted a 'manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.'"[53] In answering this question in the affirmative, the court noted that the plaintiffs contended that defendants "employed a *manipulative or deceptive device or contrivance* ... [and that the] ulterior purpose of this *scheme* was to evade Livent's contractual obligations under the change-of-control clause...."[54] Based on the conclusion that plaintiffs were alleging a fraudulent scheme, and proof of this scheme was a *necessary element* to proving that defendants had tortiously interfered with plaintiffs' contract, the court concluded that the claim was preempted.

---

48. *McEachern, 2001 WL 747320,* at *2, n. 1.

49. *Id.* at *3 (emphasis added). As this question reveals, the issue in *McEachern* was not whether the defendants had allegedly made misstatements, but whether those misstatements were "in connection with" the purchase or sale of a covered security. The phrasing of the court's question, however, indicates that the complaint in *McEachern* contained explicit allegations of misstatements.

50. No preemption decision was made in *McEachern*, which merely called for additional evidence and briefing.

51. 151 F.Supp.2d at 443.

52. *Id.* (*citing* paragraph 447 of the complaint) (emphasis added).

53. *Id.*

54. *Id.* (emphasis added).

These cases provide guidance to how this Court should apply *Spielman*. Regardless of the words used by plaintiffs in their complaints and regardless of the labels they paste on each claim, the question is whether a material misstatement or omission in connection with the purchase or sale of a covered security is a *necessary component* of the claim. To make this determination the simple inquiry is whether plaintiff is pleading fraud in words or substance. In *Hines* and *In re Livent* it was not difficult for the courts to answer this question. The gravamen of each of those complaints was a fraudulent or manipulative scheme: some claims *explicitly* alleged fraud, while others did not. But the real question was whether the claim was based on fraudulent conduct, regardless of the appearance of the words "fraud" or "misrepresentation." While no decision was made in *McEachern*, plaintiffs in that case *also* pled that there were "misrepresentations."

In sum, the "necessary component" test makes a good deal of sense. *First*, it provides a practical rule that is easily followed by courts assessing claims of SLUSA preemption. *Second*, it strikes the proper balance between respect for the way that plaintiff has pleaded her claims on the one hand, and for Congress's desire to ensure that all securities fraud claims are litigated in federal court and under federal law, on the other. Simply because the operative facts of a complaint *can* give rise to a claim of fraud does not mean that the complaint *must* be read as alleging fraud. To the contrary, a plaintiff is ordinarily free to choose the legal theories upon which she relies and to discard others. "Where the plaintiff's claim might be brought under either federal or state law, the plaintiff is normally free to ignore the federal question and rest his claim solely on the state ground." [55] The choice of legal theories is a strategic choice to be made by plaintiff, and neither the court nor the defendant is permitted to override that choice.[56]

Defendant relies heavily on *Dudek v. Prudential Securities, Inc.*,[57] which applied the "misrepresentations or omissions" prong of SLUSA to a complaint that disclaimed any explicit allegation of fraud. In *Dudek* the court divined the true meaning of the complaint by relying on prior iterations of plaintiff's complaint as an interpretive tool.[58] The court held that "[a]lthough plaintiffs deleted the allegations of fraud, misrepresentation, and non-disclosure that permeated their New York complaint, the fact allegations in the two complaints are otherwise essentially the same...."[59] While this *ad hoc* approach

---

**55.** *Federated Dep't Stores Ins. v. Moitie*, 452 U.S. 394, 406–07, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981).

**56.** *See The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716 (1913) (Holmes, J.) ("Of course, the party who brings a suit is master to decide what law he will rely on...."); *Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 831, 122 S.Ct. 1889, 153 L.Ed.2d 13 (2002) (same).

**57.** 295 F.3d 875, 879 (8th Cir.2002).

**58.** *See also Green v. Ameritrade, Inc.*, 120 F.Supp.2d 795, 798 (D.Neb.2000) ("Green's amended complaint, unlike his state court petition, contains no allegations that Ameritrade made any misrepresentations or that it engaged in any deceptive practices."), *aff'd*, 279 F.3d 590 (8th Cir.2002).

**59.** *Dudek*, 295 F.3d at 879. CSFB also relies on a recent case from the Eleventh Circuit, in which that court affirmed the dismissal of a class action complaint alleging breach of contract, breach of implied covenants and duties, breach of fiduciary duty, and unjust enrichment. *See Behlen v. Merrill Lynch*, 311 F.3d 1087 (11 Cir.2002). In that case, however, whether the plaintiff alleged misrepresentations or omissions was not an issue. *See id.*

may have merit in those instances where there was a prior complaint, and the later complaint alleged identical facts but different theories in a transparent attempt to avoid preemption, this approach is of no use when there is no earlier pleading.[60] In those cases, the proper test is to determine the "necessary components" of the claim.

### 3. SLUSA Does Not Bar Xpedior's Claims

#### a. Xpedior Does Not Allege an "Untrue Statement or Omission"

■ Under the "necessary component" test, none of Xpedior's claims are preempted by SLUSA. None of the state law claims asserted by Xpedior – breach of contract, breach of the implied covenants of good faith and fair dealing, breach of fiduciary duty, or unjust enrichment – require misrepresentations or omissions as a necessary element.

■ Nor do any of Xpedior's claims "sound in fraud." A claim sounds in fraud when, although not an essential element of the claim, the plaintiff alleges fraud as an integral part of the conduct giving rise to the claim. Thus, in *Rombach v. Chang*, the Second Circuit held that claims under sections 11 and 12 of the Exchange Act (which prohibit false statements in registration statements or prospectuses, regardless of the defendant's intent in making the misstatement) sound in fraud when plaintiff alleges that the misstatements were part of a larger scheme to defraud.[61] Along the same lines, a contract claim might sound in fraud if plaintiff alleges that defendant entered into the contract with the then-present intention not to perform.

Xpedior's Complaint contains no such allegations. To the contrary, Xpedior alleges only that DLJ acted contrary to its express and implied duties. That DLJ might, in fact, never have intended to perform under the terms of the contract is irrelevant; that is not what Xpedior is alleging. Xpedior's claims require no evidence of DLJ's mental state at all, nor has Xpedior made any allegations about DLJ's mental state at the time that the parties entered into the underwriting contract. Accordingly, Xpedior's claims do not sound in fraud.

#### b. Xpedior Does Not Allege a "Manipulative or Deceptive Device"

■ For the same reasons, Xpedior does not allege "any manipulative or de-

---

at 1094 ("Behlen *specifically alleged* that the defendants 'negligently, recklessly or intentionally *misrepresented* the fact that Plaintiff and the class would be sold Class A shares,' but 'sold to them more expensive Class B shares.'") (emphasis added). The only question was whether those misrepresentations and omissions were made "in connection with" the purchase or sale of a covered security, *see id.* at 1092 ("Behlen ... argues that the case was not removable, because the action was not a 'covered class action' and the misconduct alleged in the complaint was not 'in connection with' the sale or purchase of a security."), an entirely different element of SLUSA preemption.

60. CSFB argues, in essence, that Xpedior's common law claims are "upon analysis, utter-

ly incoherent," a contention that is no different than its argument that Xpedior's Complaint fails to state a claim under Rule 12(b)(6). Because Xpedior's common law claims cannot survive as pled, CSFB argues that Xpedior must *really* be asserting fraud claims. But this argument misses the point. If Xpedior's Complaint fails to state a claim, I need not reach the SLUSA issue; the Complaint would be dismissed under Rule 12(b)(6).

61. *See Rombach*, 355 F.3d at 171 ("[W]hile a plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2), claims that do rely upon averments of fraud are subject to the test of Rule 9(b).").

ceptive device or contrivance." [62] "Manipulation is 'virtually a term of art when used in connection with securities markets.' The term refers generally to practices such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." [63] Although the conduct alleged may (or may not) constitute manipulation if brought in a securities fraud lawsuit, that is not what Xpedior alleges in its Complaint. Moreover, it is unnecessary for Xpedior to prove that DLJ manipulated the market in order to prevail on its contract claim, as pleaded.

#### c. Summary

Because Xpedior's Complaint alleges neither "a misrepresentation or omission of a material fact" nor "that the defendant used or employed any manipulative or deceptive device or contrivance," it is not preempted by SLUSA. Because this element of SLUSA is not satisfied, I make no finding with respect to Xpedior's argument that its claims do not satisfy SLUSA's requirement that the allegations be made "in connection with the purchase or sale of a covered security." [64]

### B. Xpedior's Complaint States Viable Claims

CSFB next argues that, even if SLUSA does not preempt Xpedior's claims, those claims are deficient as a matter of law.

### 1. Breach of Contract

DLJ argues that Xpedior's breach of contract claim must be dismissed for two reasons: (1) Xpedior cannot identify a contract term in either the underwriting agreement or prospectus that DLJ breached, and (2) Xpedior does not have any cognizable contract damages.

#### a. Contract Terms

■ CSFB argues that Xpedior has failed to identify the express terms of the underwriting agreement or prospectus that DLJ breached, and therefore its breach of contract claim must be dismissed. This argument is flawed for two reasons, one legal and one factual. *First,* all that is required at this stage of the proceedings is "a short and plain statement of the claim showing that the pleader is entitled to relief." [65] Simply put, "Rule 8 pleading is extremely permissive." [66] As the Supreme Court recently emphasized: "Such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " [67] "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." [68]

■ "The essential elements to pleading a breach of contract under New York law are the making of an agreement, performance by the plaintiff, breach by the defendant, and damages suffered by the

---

**62.** 15 U.S.C. § 78bb(f)(1).

**63.** *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 476–77, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)).

**64.** 15 U.S.C. § 78bb(f)(1). *See, e.g., Green,* 279 F.3d at 597–99.

**65.** Fed.R.Civ.P. 8(a)(2).

**66.** *Wynder v. McMahon,* 360 F.3d 73, 76–77 (2d Cir.2004).

**67.** *Swierkiewicz,* 534 U.S. at 514, 122 S.Ct. 992 (quoting *Conley,* 355 U.S. at 47, 78 S.Ct. 99).

**68.** *Id.*

plaintiff."[69] Under the Rules's liberal pleading standard, a plaintiff is not even required to allege the elements of the claims she asserts.[70] Nonetheless, in this case, Xpedior has alleged the following elements of a breach of contract claim:

(1) DLJ entered into a contract to underwrite Xpedior's IPO;[71]

(2) Xpedior complied with the contract;[72]

(3) DLJ breached that contract by, for example, failing to sell the stock to the public as set forth in the prospectus and failing to sell it at the agreed upon price;[73]

(4) Xpedior was damaged by those breaches.[74]

These allegations, along with the numerous other factual allegations contained in the Complaint, give CSFB fair notice of the claims that are brought against it.[75] Nothing more is required of Xpedior at the pleading stage.[76]

*Second,* as a factual matter, Xpedior *has* identified specific contractual provisions that it alleges DLJ breached. In particular, Xpedior points to sections 2 and 3 of the underwriting agreement, which "established a fixed amount of compensation DLJ was to receive in connection with Xpedior's IPO by setting forth the underwriting spread," and required that DLJ make a "public offering" of the IPO shares "upon the terms set forth in the Prospectus," which included, for example, the per share offering price.[77]

### b. Contract Damages

 CSFB further argues that the breach of contract claim is legally deficient because there is no measure of contract damages that can compensate Xpedior. This argument is premature.

 Contract damages can take any of three forms.[78] Any of "expectation, reliance or restitution damages may be appropriate, bearing in mind that Plaintiff must *prove* any claimed damages were caused by Defendant's breach to a reasonable degree of certainty."[79] CSFB argues, in essence, that Xpedior has a causation problem: "There is no compensable expectancy interest where, as here, there is no connection between the alleged breach of contract and the alleged harm."[80] If

69. *Startech, Inc. v. VSA Arts,* 126 F.Supp.2d 234, 236 (S.D.N.Y.2000). *See also Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525 (2d Cir.1994).

70. *See In re Initial Public Offering Sec. Litig.,* 241 F.Supp.2d 281, 342 (S.D.N.Y.2003) ("Rule 8 does not require plaintiffs to plead the elements of a claim.").

71. *See* Compl. ¶ 33.

72. *See id.* ¶ 42.

73. *See id.* ¶¶ 35–39.

74. *See id.* ¶¶ 40–41, 44.

75. *See Conley,* 355 U.S. at 47, 78 S.Ct. 99.

76. *See Swierkiewicz,* 534 U.S. at 514, 122 S.Ct. 992; *see also Higgs v. Carver,* 286 F.3d 437, 439 (7th Cir.2002) (Posner, J.) ("All that's required to state a claim in a complaint filed in a federal court is a short statement, in plain (that is, ordinary, non-legalistic) English, of the legal claim.").

77. *See* Compl. ¶¶ 36–40.

78. *See* RESTATEMENT (SECOND) OF CONTRACT § 344 (1981).

79. *County of Washington v. Counties of Warren & Washington Indus. Dev. Agency,* No. 93 Civ. 86, 1997 WL 152001, at *9 (N.D.N.Y. Mar.31, 1997) (emphasis added); *see also Schwartz v. Fortune Magazine,* 89 F.Supp.2d 429, 435 (S.D.N.Y.1999).

80. Def Mem. at 13. *See also id.* at 14 ("there are no reliance damages because, as with expectancy damages, Xpedior has not shown any harm to it caused by the alleged

Xpedior, as a matter of proof, cannot establish a causal connection between DLJ's alleged breach and its own damages, then surely its contract claims will fail. But such questions are appropriately handled at summary judgment or trial, not on a motion to dismiss.[81]

At this stage, Xpedior need only put DLJ on notice of its claims, which for the reasons stated above,[82] it has. Under Rule 8(a), Xpedior need only allege that it was damaged; it is not required to specify the measure of damages nor to plead proof of causation.[83]

## 2. Breach of Implied Covenants

 CSFB next argues that Xpedior's claim for breach of the implied covenants of good faith and fair dealing fail because, as a matter of New York law, the same operative facts cannot simultaneously give rise to claims for both implied and express covenants.[84] This is certainly an accurate statement of the law, and Xpedior does not contest that its good faith claims

are indistinguishable from its contract claims.[85]

It does not follow, however, that this claim must be dismissed. To the contrary, the Federal Rules explicitly permit a party to plead causes of action in the alternative, "regardless of consistency." [86] Thus, while Xpedior may not press both claims *to judgment,* it is free to litigate both.

## 3. Breach of Fiduciary Duty

 CSFB next argues that Xpedior's claim of breach of fiduciary duties falls within the scope of the Martin Act,[87] New York's securities statute.[88] This contention is without merit because the Complaint does not allege violations of any securities law – state or federal. This lawsuit involves a contract dispute, not a securities action.[89] "[T]here is nothing in . . . the New York Court of Appeals cases [cited by the defendants] or in the text of the Martin Act itself to indicate an intention to abrogate common law causes of action." [90]

---

breach."); *id.* ("The asserted remedy of [restitution] is . . . totally unrelated to the alleged wrong of taking excessive commissions in the aftermarket.").

81. *See, e.g., In re Initial Public Offering Sec. Litig.,* 241 F.Supp.2d at 351 n. 80 ("Defendants also argue that anyone who held securities that traded above their offering price on the date of the lawsuit should be precluded from suing [because they have no damages]. While such Plaintiffs may indeed be unable to *prove* damages, that is not an appropriate question at this stage.") (emphasis added).

82. *See supra* Part III.B.1.a.

83. *See* Compl. ¶ 44 ("Plaintiff and other members of the Class have been damaged by DLJ's breaches of contract in an amount to be proven at trial.").

84. *See* Def. Mem. at 21 (citing *Harris v. Provident Life & Accident Ins. Co.,* 310 F.3d 73, 81 (2d Cir.2002)).

85. *See* Plaintiff Xpedior Creditor Trust's Memorandum of Law in Opposition to Defendant Credit Suisse First Boston (USA) Inc.'s Motion to Dismiss ("Pl.Mem.") at 21.

86. Fed.R.Civ.P. 8(e)(2).

87. N.Y. Gen. Bus. Law §§ 352 to 359–h.

88. *See, e.g., id.* § 352–c. ("It shall be illegal . . . to use or employ any of the following acts or practices . . . [involving fraud, deception, etc.] . . . where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities. . . .").

89. *See supra* Part III.A.

90. *Cromer Finance Ltd. v. Berger,* No. 00 Civ. 2498, 2001 WL 1112548, at *4 (S.D.N.Y. Sept.19, 2001).
 CSFB also argues that Xpedior's fiduciary duty claim fails because it is "conclusory"

### 4. Unjust Enrichment

██ CSFB's final argument is that Xpedior's unjust enrichment claim fails in the absence of allegations of fraud. "The only benefit that Xpedior conferred on DLJ was its shares, for which it received the agreed-upon purchase price. To say that DLJ was unjustly enriched by receipt of these shares would require Xpedior to assert a legal claim it has foresworn to assert: that the shares were worth more than the purchase price.... But that claim necessarily implies a misrepresentation or omission concerning the value of the shares...." [91]

██ Xpedior counters that its unjust enrichment claim is premised on the " 'excessive underwriting and other compensation' that DLJ derived from its favored clients, above what DLJ should have received pursuant to the parties' agreement." [92] Although such an allegation could constitute unjust enrichment, Xpedior lacks standing to assert that claim. Unjust enrichment requires "(1) that the defendant was enriched; (2) that the enrichment was at *the plaintiff's expense;* and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property *to the plaintiff.*" [93]

Xpedior does not allege that DLJ was enriched at its expense. To the contrary, DLJ allegedly received excess compensation from its own customers. They, not Xpedior, might have a cause of action. [94] Xpedior's reliance on *Diamond v. Oreamuno* [95] is misplaced. In that case, the Court of Appeals considered the viability of a breach of fiduciary duty claim in light of the absence of allegations that the plaintiff itself was damaged by the breach. The Court held: "It is true that the complaint before us does not contain any allegation of damages to the corporation but this has never been considered to be an essential requirement for a cause of action *founded on a breach of fiduciary duty.*" [96]

As noted above, however, that the defendant enriched itself at plaintiff's expense *is* an element of an unjust enrichment claim. As CSFB rightly notes, the unjust enrichment claim *only* makes sense if Xpedior is alleging that DLJ misled it by intentionally underpricing the IPO – in that case, the excessive underwriting fees might have been obtained at Xpedior's expense. But Xpedior has specifically disavowed allegations of fraud in order to avoid SLUSA preemption, as is its right. Xpedior cannot have it both ways. The unjust enrichment claim must be dismissed.

### 5. Indemnification

As a final matter, Xpedior seeks – as one possible measure of damages – indemnification for its costs associated with defending the lawsuit styled *In re Initial*

---

and does not allege a fiduciary relationship between Xpedior and DLJ. These arguments were considered and rejected in the *MDCM* case and, for the same reasons, are rejected here. *See MDCM,* 216 F.Supp.2d at 260.

**91.** Def. Mem. at 23.

**92.** Pl. Mem. at 24 (quoting Compl. ¶ 60).

**93.** *Golden Pac. Bancorp v. FDIC,* 273 F.3d 509, 519 (2d Cir.2001) (emphases added).

**94.** *See, e.g., EBC I, Inc. v. Goldman Sachs & Co.,* Index No. 601805/2002 (Sup.Ct.N.Y.Co.

May 2, 2003) ("plaintiff cannot maintain the cause of action for unjust enrichment because defendant Goldman received the alleged kickbacks from third-party customers rather than plaintiff eToys and, therefore, restitution does not belong to eToys as a matter of equity.").

**95.** 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969).

**96.** *Id.* at 498, 301 N.Y.S.2d 78, 248 N.E.2d 910 (emphasis added).

*Public Offering Securities Litigation,* consolidated before this Court. CSFB initially argued that Xpedior lacks standing to pursue this remedy "because Xpedior is not a defendant in any of the constituent cases comprising the *IPO Securities Litigation.*"[97]

CSFB did not press this argument in its reply papers, and in any event, its contention is incorrect as a factual matter. One of the cases consolidated into the *IPO* litigation is *In re Xpedior, Inc. Securities Litigation.*[98] Although Xpedior itself was dropped from the case after it filed bankruptcy,[99] it at one point was a named defendant and, presumably, incurred some expenses defending itself.

## IV. CONCLUSION

For the reasons just given, CSFB's motion to dismiss is denied, except as to the unjust enrichment claim, which is dismissed with prejudice. The Clerk is directed to close this motion [# 14]. A conference is scheduled for March 29, 2004, at 4:30 p.m. in Courtroom 15C.

SO ORDERED.

---

97. Def. Mem. at 24.

98. No. 01 Civ. 10984 (S.D.N.Y. filed Dec. 5, 2001).

99. *See* Amended Consolidated Class Action Complaint ¶ 20 ("In or about April 2001, Xpedior filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code. For this reason and this reason alone, Xpedior has not been named a Defendant in this action."), *In re Xpedior, Inc. Sec. Litig.,* No. 01 Civ. 10983 (S.D.N.Y. filed Apr. 19, 2002).