**XPEDIOR CREDITOR TRUST, on behalf of itself and others similarly situated, Plaintiff,**

**v.**

**CREDIT SUISSE FIRST BOSTON (USA) INC., as successor-in-interest to Donaldson, Lufkin & Jenrette Securities Corporation, Defendant.**

No. 02 Civ. 9149(SAS).

United States District Court, S.D. New York.

Aug. 2, 2005.

Steven J. Toll, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, H. Laddie Montague, Jr., Lawrence J. Lederer, Charles Goodwin, Jennifer E. MacNaughton–Wong, Berger & Montague, P.C., Philadelphia, PA, Linda P. Nussbaum, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., New York City, for Plaintiff.

Peter K. Vigeland, Wilmer, Cutler & Pickering, New York City, Sam J. Salario, Jr., Carlton Fields, Tampa, FL, for Defendant.

### *OPINION AND ORDER*

SCHEINDLIN, District Judge.

## I. BACKGROUND

On March 9, 2004, I issued an opinion resolving the motion to dismiss of defendant Credit Suisse First Boston (USA) Inc. ("CSFB"), which included a summary of the claims of plaintiff and putative class representative Xpedior Creditor Trust (the "Creditor Trust").[1] Familiarity with that opinion is assumed.

On May 20, 1999, Xpedior, Inc. ("Xpedior") held its initial public offering ("IPO").[2] Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ") served as lead underwriter for Xpedior's IPO. On March 27, 2002, the United States Bankruptcy Court for the Northern District of Illinois transferred all of Xpedior's assets to the Creditor Trust. The Creditor Trust has sued CSFB, the successor in interest to DLJ, alleging that DLJ underpriced Xpedior's IPO and the IPOs of similarly situated issuers of securities "who, during the period January 1, 1998 through October 31, 2000, issued securities in IPOs that increased in value 15% or more" within 30 days of the IPO, for whom DLJ served as a lead or co-lead underwriter.[3]

The Creditor Trust asserts three causes of action.[4] *First*, the Creditor Trust alleges that DLJ breached the terms of the underwriting agreement in the following ways: (1) by failing to sell Xpedior shares to the public as required by the underwriting agreement, and instead selling to its favored customers; (2) by requiring purchasers to pay a higher price for shares than provided in Xpedior's prospectus in violation of the underwriting agreement; and (3) by increasing DLJ's compensation in violation of the fixed 'underwriting spread' set forth in the underwriting agreement by virtue of DLJ's allocation

---

1. *See Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.,* 341 F.Supp.2d 258, 262–64 (S.D.N.Y.2004).

2. *See* Xpedior Prospectus, Ex. 8 to 4/29/05 Declaration of Jill I. Freeman, counsel for plaintiff ("Freeman Decl.").

3. Complaint ¶ 10.

4. A fourth cause of action for unjust enrichment has already been dismissed. *See id.* at 274.

and profit-sharing arrangements.[5] *Second*, the Creditor Trust alleges that DLJ violated the implied covenant of good faith and fair dealing associated with the underwriting agreement by allocating underpriced shares to favored customers and receiving excessive compensation in return.[6] *Finally*, the Creditor Trust alleges that DLJ violated its fiduciary duty by sharing in the profits made by its customers as a result of DLJ's underpricing of the Xpedior IPO.[7]

The Complaint alleges that Xpedior's IPO and the IPOs of other class members were underpriced, but does not explicitly cite that underpricing as the basis for Xpedior's claims.[8] Rather, the Complaint refers repeatedly to an "underpricing environment" as the background for DLJ's alleged fraud, and alleges that DLJ took advantage of that environment to share profits with its customers pursuant to secret agreements.[9] As originally drafted, though, the Complaint does not allege that DLJ *caused* the underpricing of Xpedior's IPO. Plaintiffs now assert that intentional underpricing allegations were not included in the original Complaint because "class-wide allegations of intentional underpricing would seem to be preempted under the Securities Litigation Uniform Standards Act's ("SLUSA's") provision that '[n]o covered class action based on [state law] . . . may be maintained in any . . . court by any private party alleging (a) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or (b) that the defendant used or employed any manipulative or deceptive device . . . .' "[10]

On February 28, 2005, CSFB filed a motion for summary judgment against the Creditor Trust.[11] On April 29, 2005, Xpedior submitted its opposition to CSFB's motion for summary judgment, which culminated in the following footnote:

> Because the record indicates that the underpricing of Plaintiff's IPO shares is not a matter of innocent happenstance but rather was at least foreseeable to DLJ, Plaintiff is this day sending a letter to Defendant proposing that Plaintiff

---

5. *See* Complaint ("Compl.") ¶¶ 36–40.

6. *See id.* ¶¶ 46–50.

7. *See id.* ¶¶ 51–54.

8. *See id.* ¶ 2 ("the IPO securities of Xpedior and absent class members were underpriced, creating the environment in which DLJ allocated the underpriced IPO stock of these issuers to certain of DLJ's favored clients"); ¶ 32 ("These allocation and compensation practices that were committed in the underpricing environment . . . permitted DLJ to obtain millions of dollars in compensation. . . ."); Prayer for Relief ¶ A ("Finding that DLJ (1) breached the contracts . . . by exploiting the circumstances of the IPO shares . . . being underpriced; (2) breached DLJ's covenant of good faith and fair dealing implied in those contracts by availing itself of the underpricing . . .; (3) breached [its] fiduciary duties . . . by availing itself of the underpricing. . . ."). Each of these allegations asserts that DLJ took advantage of a *pre-existing* environment of underpricing, but not that

DLJ *caused* the underpricing. While contesting CSFB's motion to dismiss the original Complaint, the Creditor Trust "specifically disavowed" allegations "that DLJ misled it by intentionally underpricing the IPO." *See Xpedior*, 341 F.Supp.2d at 273. *See also id.* at 270 ("Although the conduct alleged may (or may not) constitute manipulation if brought in a securities fraud lawsuit, that is not what Xpedior alleges. . . .").

9. *See* Complaint Prayer for Relief ¶ A.

10. Plaintiff's Memorandum of Law in Support of Its Motion for Leave to Amend Pursuant to Rule 15 of the Federal Rules of Civil Procedure ("Leave To Amend Mem.") at 3 (quoting 15 U.S.C. § 78bb(f)).

11. *See* Memorandum of Law in Support of Defendant Credit Suisse First Boston (USA) Inc.'s Motion for Summary Judgment ("SJ Mem.").

file an Amended Complaint which conforms to the evidence and deletes the class allegations. . . . [12]

On May 20, 2005, CSFB filed its reply, which reiterated its original arguments in support of summary judgment and opposed the Creditor Trust's revised allegations.[13]

On June 7, 2005, the New York Court of Appeals decided *EBC I v. Goldman Sachs & Co.*,[14] which considered, on a motion to dismiss, claims very similar to those brought by the Creditor Trust. *EBC I* also involves a creditor trust suing the lead underwriter of an IPO for, among other things, breach of contract, breach of the covenant of good faith and fair dealing, and breach of fiduciary duty.[15] The claims brought by both the Creditor Trust and EBC I are based on offering documents and allegations so similar that any attempt to distinguish the allegations would be fruitless.[16]

Accordingly, on June 24, 2005, the Creditor Trust submitted a formal motion to amend its Complaint by deleting the breach of contract claim (to conform with *EBC I*), deleting the class allegations and altering the factual allegations to allege intentional underpricing as a basis for plaintiffs' claims.[17] CSFB opposes the proposed amendment on the grounds that the amended complaint is not brought in good faith, that the Creditor Trust's motion for leave to amend comes after undue and prejudicial delay, and because the amended complaint would not survive summary judgment, rendering the amendment futile.

## II. LEGAL STANDARD

### a. Leave to Amend

Rule 15(a) of the Federal Rules of Civil Procedure provides that a party may amend its pleading "only by leave of court or by written consent of the adverse party; and leave should be freely given when justice so requires." [18] The decision whether to grant leave to amend lies within the sound discretion of the court.[19]

---

**12.** Xpedior Creditor Trust's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("SJ Opp.") at 25 n. 14.

**13.** *See* Reply Memorandum of Law in Further Support of Defendant Credit Suisse First Boston (USA) Inc.'s Motion for Summary Judgment ("SJ Reply").

**14.** 5 N.Y.3d 11, 799 N.Y.S.2d 170, 832 N.E.2d 26 (2005).

**15.** *EBC I* also dismissed the plaintiff's claims of professional malpractice and unjust enrichment, and held that leave to replead was appropriate with respect to a fraud claim. *See EBC I*, 5 N.Y.3d 11, 799 N.Y.S.2d 170, 832 N.E.2d 26, at Part III (page not available on Westlaw).

**16.** For example, the *EBC I* breach of contract claim was premised on an underwriting agreement that "provided that Goldman Sachs would offer the shares for public sale upon the terms and conditions set forth in the Prospectus," and the prospectus of eToys,

EBC I's predecessor in interest, contained a section describing underwriting spread and compensation functionally identical to the Xpedior prospectus. *Compare* 5/20/99 eToys Prospectus, SEC Filing No. 99630862 at F–38 ("the per share and total underwriting discounts and commissions to be paid to the underwriters by eToys" equal $1.35 per share) *with* Xpedior Prospectus at 70 ("the underwriting fees to be paid by [Xpedior] in connection with this offering" equal $1.33 per share).

**17.** *See* Leave to Amend Mem. at 2.

**18.** Fed.R.Civ.P. 15(a); *see also Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Nerney v. Valente & Sons Repair Shop*, 66 F.3d 25, 28 (2d Cir.1995); *In re Initial Public Offering Sec. Litig.*, 214 F.R.D. 117, 119 (S.D.N.Y.2002).

**19.** *See Foman*, 371 U.S. at 182, 83 S.Ct. 227; *Rush v. Artuz*, No. 00 Civ. 3436, 2001 WL 1313465, at *5 (S.D.N.Y. Oct. 26, 2001).

"When a cause of action is dismissed because of pleading deficiencies, the usual remedy is to permit plaintiff to replead its case. This policy is especially appropriate in the context of claims dismissed under Rule 9(b) because the law favors resolving disputes on their merits." [20] As a general rule, however, leave should only be denied for reasons such as undue delay on the part of the moving party, bad faith, repeated failure to cure deficiencies in pleading, undue prejudice or futility of the amendment. [21]

## III. DISCUSSION

### A. Leave to Amend

■ CSFB first argues that the timing of the Creditor Trust's proposed amendment—which first appeared after CSFB had submitted its memorandum in support of summary judgment and the Creditor Trust had submitted its opposition—supports CSFB's contention that the motion to amend should be denied. CSFB argues that the Creditor Trust unduly delayed its proposed amendment, submitted the amendment in bad faith, and sought to prejudice CSFB. [22] All of these arguments share the same theme: that the Creditor Trust knew its original claims were unsupported by the evidence, but nonetheless delayed its amendment until briefing was nearly complete on CSFB's motion for summary judgment, hoping to avoid dismissal of the Creditor Trust's claims and trick CSFB into wasting time and resources in irrelevant discovery and motion practice.

CSFB asserts that "[t]he Creditor Trust's motion to amend could have been made long ago, when CSFB produced the pot books in November 2003, which are the alleged basis for the proposed amendments." [23] The Creditor Trust counters that the amendment was proposed only three months after the close of deposition discovery. [24] The Creditor Trust has the better argument. The Creditor Trust did not find substantial evidence *contradicting* its original claims; it simply failed to find sufficient evidence *supporting* its original claims. [25] Waiting until the close of discovery to determine whether sufficient evidence supported the Creditor Trust's claims does not evince bad faith; rather, it reflects prudence in not abandoning an argument prematurely.

CSFB also argues that, without abandoning its *quid pro quo* class action claims, the Creditor Trust could have moved to amend the Complaint to add individual underpricing claims in addition to the original class claims as soon as the Creditor Trust came to the conclusion that the alleged IPO underpricing reflected intentional wrongdoing. [26] However, as noted

---

**20.** *In re Initial Public Offering Sec. Litig.,* 241 F.Supp.2d 281, 397 (S.D.N.Y.2003).

**21.** *See Foman,* 371 U.S. at 182, 83 S.Ct. 227; *Richardson Greenshields Sec., Inc. v. Lau,* 825 F.2d 647, 653 n. 6 (2d Cir.1987).

**22.** *See* Memorandum of Law in Opposition to Plaintiff Xpedior Creditor Trust's Motion to Amend the Complaint ("Leave to Amend Opp.") at 4–13.

**23.** *Id.* at 4.

**24.** *See* Leave to Amend Mem. at 11 (noting that deposition discovery closed on February 1, 2005, and the proposed amendment was submitted with the SJ Opp. on April 29, 2005).

**25.** *See* Plaintiff's Reply Memorandum of Law in Further Support of Its Motion to Amend Complaint Pursuant to Rule 15 of the Federal Rules of Civil Procedure ("Leave to Amend Reply") at 3; 6/24/05 Hearing Transcript at 24:16–18.

**26.** *See* Leave to Amend Opp. at 6 ("As a pleading matter, there is no prohibition against the combination of class and individual claims in a single complaint.").

by the Creditor Trust, SLUSA preempts class actions based on state law that rest on allegations of securities fraud.[27] Thus, had the Creditor Trust added its intentional underpricing claims, which sound in fraud, while maintaining its class action allegations, it would have risked one of two detrimental outcomes. *First*, had the Creditor Trust focused on its individual underpricing claims while trying to pursue its class allegations with respect to entirely different conduct—and thus based its own claims on different conduct than that of the rest of the class—the Creditor Trust would have risked denial of class certification on the grounds of atypicality. *Second*, had the Creditor Trust sought to add the underpricing claims to its class allegations, it would risk dismissal under SLUSA. With these risks in mind, it is understandable that the Creditor Trust waited until it was sure its class claims lacked sufficient evidentiary support before adding intentional underpricing claims to the Complaint.

Nonetheless, the tardiness of the Creditor Trust's proposed amendment is unjustified. After the close of discovery, the Creditor Trust had obtained all the relevant evidence, and should have known whether its original claims were supported by sufficient evidence to withstand CSFB's proposed motion for summary judgment. The Creditor Trust's hypothetical that "[h]ad Xpedior sought amendment in the

27 days between the last deposition and CSFB's February 28, 2005 motion for summary judgment, CSFB would have argued that Xpedior was seeking to derail the scheduling of CSFB's summary judgment and that the amendment was barred because the Court had granted CSFB special permission to bring an early summary judgment motion" makes little sense.[28] Any prejudice to CSFB by delaying its motion for summary judgment was exacerbated by waiting until substantial briefing had occurred before proposing an amendment. By waiting to amend its Complaint until CSFB had already filed its motion for summary judgment, the Creditor Trust essentially converted the Complaint into a moving target, dodging CSFB's motion by rewriting the facts. Whether this maneuver was intended as a bait-and-switch is irrelevant; the fact remains that the Creditor Trust withheld its amendment until CSFB had already wasted time drafting a motion for summary judgment on claims that the Creditor Trust was no longer pursuing.

That said, portions of the Creditor Trust's proposed amendment do not prejudice CSFB, and should be permitted. The Creditor Trust's proposed deletion, in light of *EBC I*, of the original Count I—breach of contract—does not prejudice CSFB. Neither does the deletion of the Creditor Trust's class action allegations.[29] However, the Creditor Trust's proposed amend-

**27.** *See* Leave to Amend Mem. at 6–7; 15 U.S.C. § 78bb(f).

**28.** Leave to Amend Reply at 6. The Creditor Trust's assertion that the "early" timing of the summary judgment motion was "special" is unsupported. *See also* Leave to Amend Mem. at 15 (asserting that the "usual order" of putative class action proceedings involves "class certification, followed by complete merits discovery, followed by contention interrogatories, followed by summary judgment"). Nothing in Rule 23 mandates that class certification should be addressed before

summary judgment. Indeed, in this case, addressing class certification before summary judgment might have wasted even more time, by focusing on the nature of the class claims rather than on the existence (or, in this case, non-existence) of sufficient evidence supporting those claims.

**29.** Plaintiffs have, however, made it clear that they wish to drop their class action allegations only if they are allowed to add underpricing allegations to their Complaint. *See* 6/3/05 Letter from CSFB to the Court, at 2.

ment of its original Count II—breach of the implied covenant of good faith and fair dealing—prejudices CSFB.

As originally drafted, Count II sought recovery for the same type of wrongdoing alleged in Count I: that DLJ harmed Xpedior not by underpricing Xpedior's securities, but by taking advantage of the underpricing environment to profit through DLJ's allocation practices and agreements with customers.[30] In drafting its motion for summary judgment on Count II, CSFB relied on the same arguments it used to oppose the Creditor Trust's claim for breach of contract.[31] The proposed amendment, by contrast, explicitly alleges that DLJ intentionally underpriced Xpedior's stock in bad faith, which was not a component of Counts I or II as originally drafted.[32] Had the Creditor Trust moved to amend before CSFB submitted its summary judgment motion, CSFB would not have been prejudiced with regard to Count II.[33] The Creditor Trust's delay in submitting its proposed amendments wasted CSFB's time and prevented CSFB from making arguments relevant to the Creditor Trust's intentional underpricing allegations. Accordingly, the Creditor Trust may not now amend Count

**30.** *Compare* Complaint ¶¶ 49, 51 (alleging in support of Count II that "[t]hese obligations included . . . that DLJ act in good faith and deal fairly by not taking advantage of and benefiting from the underpricing of Xpedior's and absent class members' IPO securities so that the full consideration to which Xpedior and absent Class members were entitled for their respective IPOs would be received by Plaintiff and the absent class members"; DLJ violated the covenants by "benefiting from Xpedior's underpriced IPO securities, by allocating Xpedior's undervalued shares to favored clients, and by directly or indirectly requiring and receiving additional compensation" for those shares) *with id.* ¶¶ 38–39 (alleging in support of Count I that the Underwriting Agreement established "a fixed amount of compensation DLJ was to receive" (*i.e.,* the underwriting spread) and that DLJ breached that provision when "by virtue of its allocation and profit sharing practices . . . DLJ received compensation from selling Xpedior's (and the class's) IPO shares materially in excess of the $1.33 per share . . . agreed-to amount").

**31.** Those arguments were: (1) that DLJ faithfully fulfilled all its explicit obligations; (2) that pricing the IPO at the highest price the market would bear was not contemplated by the Underwriting Agreement; (3) that the parties did not contemplate "excessive commissions" as damages; and (4) that the Creditor Trust had failed to obtain sufficient evidence that the alleged damages were causally relat- ed to the alleged breaches. *See* SJ Mem. at 8–21.

**32.** *See* 6/24/05 Proposed Amended Complaint ¶ 33.

**33.** The Creditor Trust argues that CSFB was not prejudiced in part because it addressed the question of whether the Xpedior IPO was underpriced in its motion for summary judgment. *See* Leave to Amend Mem. at 16. However, while CSFB addressed the issue of underpricing in its motion for summary judgment, it did so solely to challenge the Creditor Trust's background allegations; in effect, CSFB sought to establish, as one alternative ground for its motion, that Xpedior's IPO was not underpriced (and hence, that CSFB could not have taken advantage of that underpricing). Under the original Complaint, though, CSFB could have ignored the Creditor Trust's allegations of underpricing entirely and still prevailed; it did not need to establish that there was no underpricing to obtain summary judgment. In any event, because there was no allegation of intentional underpricing, CSFB had no incentive to address the question of whether any underpricing was intentional. Under the proposed amendment, by contrast, claims of intentional underpricing are central to the alleged wrongdoing. Thus, had CSFB been aware of the Creditor Trust's proposed amendment before filing its motion for summary judgment, CSFB would have had much more incentive to establish that the Xpedior IPO was priced fairly or, if it was not priced fairly, that the Creditor Trust had pro-

II to include intentional underpricing claims.

■ Moreover, even if the Creditor Trust were allowed to amend Count II to include underpricing claims, the amendment would be futile.[34] *EBC I*, like the instant case, involved allegations in which the defendant underwriter was alleged to have underpriced plaintiff's stock in contravention of plaintiff's goals in having an IPO.[35] The purposes of plaintiff's IPO as described in *EBC I* were virtually identical to those expressed in Xpedior's Prospectus. Thus, to withstand summary judgment with respect to its claim that Xpedior's purposes extended beyond those found insufficient as a matter of law in *EBC I*, the Creditor Trust must establish that there is a disputed issue of material fact as to whether such an additional purpose existed. The only difference now asserted by plaintiffs is that Xpedior's purposes included "getting as high a price as possible," according to the deposition testimony of Xpedior's Chief Financial Officer given in January, 2005.[36] Plaintiffs submit no corroborating evidence that pricing the IPO at the highest price the market would bear was an actual purpose of the Xpedior IPO. Indeed, this purpose conflicts with the stated purposes of several other Xpedior principals, which included ensuring that "there would be enough unmet demand from the offering ... such that the stock price would hold up and wouldn't drop below the offering price, which I considered to be quite important." [37] One uncorroborated statement of general purpose made by a single director more than five years after the Xpedior IPO—absent from the list of purposes expressed in the Prospectus and contradicted by the purposes expressed by other directors—does not suffice to create a genuine disputed issue of material fact. Accordingly, the proposed amendment of Count II would be futile.

■ However, the Creditor Trust's proposed amendment to Count III, which alleges that DLJ breached its fiduciary duty to Xpedior, does not materially change plaintiff's allegations with respect to that claim. The gravamen of that claim is that DLJ, as an advisor and underwriter to Xpedior, had a fiduciary duty "to refrain from doing any act injurious to, or which would deprive [plaintiff] of any profit or advantage." [38] The Creditor Trust alleges, in both the original Complaint and its proposed amendment, that DLJ breached this duty and deprived Xpedior of the opportunity to raise more capital.[39] Unlike the proposed amendment to Count II, which would permit an explicit claim of intentional underpricing as a breach of implied

---

duced no evidence that the underpricing was intentional.

**34.** *See Milanese v. Rust–Oleum Corp.,* 244 F.3d 104, 110 (2d Cir.2001) ("[W]here ... the parties have fully briefed the issue whether the proposed amended complaint could raise a genuine issue of fact and have presented all relevant evidence in support of their positions ... the court may deny the amendment as futile when the evidence in support of the plaintiff's proposed new claim creates no triable issue of fact and the defendants would be entitled to judgment as a matter of law under [Rule] 56(c).").

**35.** *See EBC I,* 5 N.Y.3d 11, 799 N.Y.S.2d 170, 832 N.E.2d 26, at Part I.

**36.** 1/12/05 Deposition of Stephen Isaacson, Chief Financial Officer for Xpedior, ("Isaacson Dep.") at 136:24—137:1.

**37.** 1/10/05 Deposition of David N. Campbell, CEO of Xpedior, ("Campbell Dep.") at 112:15–20. *See also* 1/26/05 Deposition of Jack Brian Farrar, Chief Operating Officer of Xpedior, at 202:11–12 ("[B]uzz arises from that strong aftermarket performance and we wanted that.").

**38.** Complaint ¶ 55; Proposed Amended Complaint ¶ 39.

**39.** *See* Complaint ¶ 55; Proposed Amended Complaint ¶ 39.

covenants arising from the parties' underwriting contract, Count III has, in effect, always been an underpricing allegation. DLJ is alleged to have abused its fiduciary position and shared in profits made by its favored customers, effectively leaving Xpedior's money on the table.[40] Because the operative facts of Count III are not substantially altered by the proposed amendments, CSFB is not prejudiced by the proposed amendment to Count III.

## B. Summary Judgment

CSFB further argues that leave to amend should be denied because the Creditor Trust's proposed amendments cannot withstand summary judgment.[41] CSFB notes that counsel for the Creditor Trust has already represented to the Court that it would require no additional discovery with respect to its proposed amendments.[42] Indeed, the Creditor Trust has already had the opportunity to rebut CSFB's assertions that the Xpedior IPO was fairly priced, and did so with full knowledge of the proposed amendments. Moreover, the Creditor Trust has responded to CSFB's

charge of futility, and asserts that, with respect to the evidence of underpricing submitted in connection with the summary judgment motion, "[t]he proposed amendment does not alter—or even affect—that evidence."[43]

· Resolving CSFB's motion for summary judgment is appropriate at this time.[44] Because the Creditor Trust seeks leave to dismiss Count I, and because leave to amend has been denied with respect to Count II and granted with respect to Count III, two counts remain to be decided on summary judgment: the original Count II and the amended Count III.

Summary judgment is appropriate if the evidence of record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[45] "An issue of fact is genuine 'if the evidence is such that a jury could return a verdict for the nonmoving party.'"[46] "A fact is material for these purposes if it 'might affect the outcome of the suit under the governing law.'"[47]

---

**40.** It should be noted that the element of underpricing in Count III, as originally pled, did not run afoul of SLUSA. Breach of fiduciary duty and fraud are different claims, and claims that a fiduciary duty was breached may be brought even in the absence of quantifiable damages, unlike claims for fraud. *See, e.g., Kimberlin v. Ciena Corp.,* No. 96 Civ. 8704, 1998 WL 603234, at *12 (S.D.N.Y. Sept. 11, 1998). Moreover, breach of fiduciary duty claims need not be based on an actionable misstatement or omission, but may rest on a charge that the fiduciary has failed to fulfill its duty. Thus, even if the Creditor Trust had alleged intentional underpricing with respect to Counts I and II, and those class claims were dismissed under SLUSA, the fiduciary duty claim could proceed in federal court as a class action *See Dabit v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 395 F.3d 25, 47 (2d Cir.2005) (allowing a fiduciary duty claim to proceed where other claims were barred by SLUSA and rejecting the argument "that where a single complaint

contains claims that include allegations triggering preemption and other claims that do not, SLUSA prohibits maintenance of the entire action").

**41.** *See* Leave to Amend Opp. at 13–15.

**42.** *See id.* at 13.

**43.** Leave to Amend Reply at 10.

**44.** *See Milanese,* 244 F.3d at 110.

**45.** Fed.R.Civ.P. 56(c).

**46.** *Overton v. New York State Div. of Military and Naval Affairs,* 373 F.3d 83, 89 (2d Cir. 2004) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

**47.** *Id.* (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The movant has the burden of demonstrating that no genuine issue of material fact exists.[48] In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, it "must do more than simply show that there is some metaphysical doubt as to the material facts," [49] and it must "come forward with 'specific facts showing that there is a genuine issue for trial.' " [50] In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor.[51]

### 1. Count II

■ Count II alleges that DLJ violated its obligations of good faith and fair dealing in connection with the Underwriting Agreement when it took advantage of Xpedior's underpricing to share profits with its customers. The underlying wrongdoing alleged in Count II is identical to that alleged with respect to Count I, which the Creditor Trust seeks to drop. Count II is also substantially identical to the implied covenant claim dismissed in *EBC I*. In that decision, the New York Court of Appeals noted that:

As stated in the Prospectus, the principal purposes of the public offering were to increase working capital, to create a public market for the common stock, to facilitate future access to public markets, and to increase eToys's visibility in

the retail marketplace. There is no dispute that the contractual objectives were achieved as a result of Goldman Sachs's underwriting services, and the complaint fails to allege otherwise.[52]

Similarly, Xpedior's Prospectus stated the goals of the Xpedior IPO:

The primary purposes of this offering are to provide a means of incentive to our professionals through stock options, obtain additional equity capital, create a public market for our common stock and facilitate future access to public markets.[53]

The Creditor Trust now asserts, based on the deposition testimony of one of the principals of Xpedior, that Xpedior's purposes in undertaking its IPO included "getting as high a price as possible." [54] The Creditor Trust argues that this interest, as well as the Prospectus's stated goal to obtain additional equity capital, distinguishes its claims from the claims dismissed in *EBC I*.

In the original Complaint, the Creditor Trust did not allege that DLJ intentionally underpriced Xpedior's (and the putative class's) securities; rather, it alleged that DLJ took advantage of the industry-wide underpricing environment to engage in profit-sharing and undisclosed compensation arrangements with favored customers. But the Creditor Trust has now conceded that it has discovered "no direct evidence that the people who got flip allocations shared profits." [55] Indeed, the

---

48. *See Powell v. National Bd. of Med. Exam'rs,* 364 F.3d 79, 84 (2d Cir.2004).

49. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

50. *Powell,* 364 F.3d at 84 (quoting *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993)).

51. *See Williams v. R.H. Donnelley Corp.,* 368 F.3d 123, 126 (2d Cir.2004).

52. *EBC I,* 5 N.Y.3d 11, 799 N.Y.S.2d 170, 832 N.E.2d 26, at Part III (page unavailable on Westlaw).

53. Xpedior Prospectus at 22.

54. *See* Isaacson Dep. at 136:24–137:1

55. 6/14/05 Hearing Transcript at 24:16–17.

Creditor Trust's opposition to CSFB's motion for summary judgment on Counts I and II rested entirely on some evidence that investors who expressed an interest in "flipping" IPO shares soon after the IPO received proportionally more allocated stock than investors who expressed the intention to purchase additional shares in the aftermarket.[56] The Creditor Trust has submitted no evidence that the alleged favoritism towards flippers resulted from any *quid pro quo* arrangements, or indeed any evidence that suggests that the alleged discrepancy favoring flippers over aftermarket purchasers resulted from any wrongdoing on the part of DLJ. Accordingly, CSFB's motion for summary judgment dismissing Count II is granted.

### 2. Count III

■ Disputed issues of material fact remain, however, with respect to Count III, which alleges that DLJ breached its fiduciary duty to Xpedior. The Creditor Trust has produced substantial evidence that Xpedior's management relied on DLJ to advise Xpedior and act in Xpedior's best interests in underwriting its IPO and setting the IPO price.[57] The Creditor Trust has also submitted evidence that DLJ believed Xpedior's shares to be more valuable than the price ultimately fixed by DLJ.[58] Accordingly, drawing all inferences in favor of the Creditor Trust, Count III presents a disputed issue of material fact.

## IV. CONCLUSION

For the foregoing reasons, plaintiff's motion for leave to amend is granted in part and denied in part. Plaintiff may amend its complaint to strike Count I, drop its class action allegations, and add allegations of intentional underpricing in support of Count III.[59] Plaintiff's motion for leave to amend is denied with respect to Count II. Defendant's motion for summary judgment is granted with respect to Count II and denied with respect to Count III. Plaintiffs shall submit a proposed amended complaint consistent with this

---

**56.** *See* SJ Opp. at 18. Specifically, the Creditor Trust asserts that customers who indicated an interest in flipping Xpedior shares, as reflected in DLJ's pot books, received, on average, more than three times as many shares, as a percentage of the number of shares requested, than those who intended to buy in the aftermarket. *See* 5/2/05 Plaintiff's Statement of Additional Undisputed Material Facts ¶ 217.

**57.** *See, e.g.,* Campbell Dep. at 174:20 (noting that Campbell relied on DLJ as the definitive price-setter for the IPO), 181:4—182:21 (noting that Xpedior shared proprietary information with DLJ, relied on DLJ's expertise, and expected DLJ to be loyal); Isaacson Dep. at 215:10–15 (noting that Xpedior received pricing information from DLJ).

**58.** *See* 12/8/99 e-mail conversation between Thomas Fox and Brian Webber, employees of DLJ, Ex. 16 to 4/29/05 Declaration of Charles P. Goodwin (plaintiff's counsel) in support of SJ Opp. Webber remarked to Fox and other DLJ employees that "After Tom and Chip left, we had a ton of later comers to the Xpedior lunch, it was standing room only. We counted something around a 100 people and it was a great presentation with a very substantial Q & A. They got a lot of questions about Agency and as you know Xpedior compares very favorably to them by all statistics" and Fox replied, to the same group, that "I think we should consider pricing on a multiple of Brian's highly additive perspectives (ie $48 per share)." Xpedior's stock was ultimately priced at $19 per share.

**59.** The Creditor Trust has previously reserved the option *not* to amend its Complaint if the proposed underpricing amendments were rejected. *See* 5/31/05 Letter from the Creditor Trust to the Court at 1 (noting that CSFB had demanded that "Plaintiff represent[ ] its intentions with respect to maintaining the class allegations if the amendment is not granted. Plaintiff refuses to make such a representation"). Although leave to amend is granted in part by this Opinion, the Creditor Trust may nonetheless choose not to amend its Complaint.

Opinion by August 15, 2005. A conference to discuss the form of notice, if any, to be directed to the putative class regarding the withdrawal of the class allegations is scheduled for 5:00 P.M. on Tuesday, August 30, in courtroom 15C. The Clerk is directed to close defendant's motion for summary judgment and plaintiffs' motion for leave to amend [numbers 40 and 47 on the docket sheet].

SO ORDERED.