[936 NYS2d 92]

EBC I, Inc., Formerly Known as eToys Inc., Appellant, v Goldman Sachs & Co., Respondent.

First Department, December 8, 2011

**APPEARANCES OF COUNSEL**

*Pomerantz Haudek Grossman & Gross LLP*, New York City (*Stanley M. Grossman, H. Adam Prussin, Murielle J. Steven Walsh, Marie L. Oliver* and *Anthony F. Maul* of counsel), and *Wachtel & Masyr, LLP*, New York City (*William B. Wachtel* and *John H. Reichman* of counsel), for appellant.

*Sullivan & Cromwell LLP*, New York City (*Penny Shane* of counsel), for respondent.

**OPINION OF THE COURT**

DeGrasse, J.

Plaintiff is the Official Committee of Unsecured Creditors of eToys, Inc., a bankrupt Internet start-up company that was

incorporated in 1996. By order of the United States Bankruptcy Court for the District of Delaware (Walrath, J.), plaintiff was granted standing as a representative of eToys' bankruptcy estate and authorized to prosecute any litigation claim on behalf of eToys and the estate. Plaintiff's instant breach of fiduciary duty and fraud claims stem from the May 20, 1999 initial public offering (IPO) of more than nine million shares of eToys' stock. Defendant, Goldman Sachs & Co., became the lead managing underwriter of the IPO pursuant to a May 19, 1999 underwriting agreement between itself and eToys. Plaintiff alleges in the amended complaint that Goldman Sachs also acted as eToys' fiduciary and, in that disputed capacity, misled the company into underpricing its IPO at $20 per share (discounted to Goldman Sachs at $18.65 per share). Plaintiff alleges in its second amended complaint that

> "[i]n sum Goldman [Sachs] served as eToys' fiduciary because eToys reposed great trust and confidence in Goldman [Sachs] in the pricing of the IPO and provided to this underwriter confidential information. Goldman [Sachs] exercised effective control over the pricing of the IPO. eToys placed utmost reliance on Goldman [Sachs] and accepted its recommended IPO price."

On the first day of trading, May 20, 1999, eToys' stock traded at between $71 and $85 per share. Within three days, the trading price sank to $48.13 and fluctuated between $28 and $50 between June 11 and September 9, 1999. The stock's average trading price was $25.20 from December 20, 1999 to January 19, 2000 and $16.95 from January 20 to February 19, 2000. Thereafter the value of eToys' shares fell even further, never again to rise above the $20 offering price. With its stock trading near zero, in March 2001 eToys filed a voluntary petition for reorganization under chapter 11 of the United States Bankruptcy Code.

On a prior appeal, which was taken from an order determining a CPLR 3211 (a) (7) motion, the Court of Appeals addressed the facial sufficiency of the breach of fiduciary duty cause of action as set forth in a prior complaint (*see* 5 NY3d 11, 19-22 [2005] [*EBC I*]). As noted above, Goldman Sachs was engaged by eToys pursuant to a written agreement. Like the complaint then before the Court of Appeals, the instant complaint alleges "an advisory relationship that was independent of the underwriting agreement" (*id.* at 20). As the Court of Appeals held, "a

cause of action for breach of fiduciary duty may survive, for pleading purposes, where the complaining party sets forth allegations that, apart from the terms of the contract, the underwriter and issuer created a relationship of higher trust than would arise from the underwriting agreement alone" (*id.*). "A fiduciary relationship 'exists between two persons when one of them is under a duty to act for or give advice for the benefit of another upon matters within the scope of the relation' " (*id.* at 19, quoting Restatement [Second] of Torts § 874, Comment *a*). In making our required fact-specific inquiry, we first examine the scope of the underwriting agreement in order to determine whether eToys and Goldman Sachs had a principal-fiduciary relationship that transcended it. Indeed, "[c]ourts look to the parties' agreements to discover, not generate, the nexus of relationship and the particular contractual expression establishing the parties' interdependency" (*Northeast Gen. Corp. v Wellington Adv.*, 82 NY2d 158, 160 [1993]).

As acknowledged in plaintiff's reply brief, the underwriting agreement was negotiated at arm's length between eToys, the issuer, and Goldman Sachs, the lead managing underwriter. The underwriters' discounted per share price of eToys' stock is an express term of the negotiated agreement. To be sure, eToys' prospectus, dated May 19, 1999, provides: "The initial public offering price for the common stock has been *negotiated* among eToys and the representatives of the underwriters" (emphasis added). Absent fraud, which will be addressed later, the undisputed arm's length negotiation of the offering price negates plaintiff's claim that it was the subject of advice given by Goldman Sachs as a fiduciary. "A conventional business relationship between parties dealing at arm's length does not give rise to fiduciary duties" (*Roni LLC v Arfa*, 74 AD3d 442, 444 [2010], *affd* 18 NY3d 846 [2011]).

Goldman Sachs had been represented in unrelated matters by eToys' securities counsel, Venture Law Group (VLG). In January 1999, when the IPO process began, VLG notified Goldman Sachs in writing of its role as eToys' securities counsel and that it would be "providing advice to eToys that is adverse to [Goldman Sachs]." Glen Van Ligten, a VLG attorney, testified that the relationship between eToys and Goldman Sachs was "adverse." Thus, the relationship between eToys and Goldman Sachs was acknowledged by eToys through its counsel to be adversarial from the outset. To be sure, Steven J. Schoch, eToys' chief financial officer (CFO), testified that "the equity capital

markets folks have the investor base as their clients and they're responsible for bringing opportunities to them." Schoch also testified that he "would never leave [his] company's fate in the hands of an investment banker. They're not looking out for your interest."

The instant IPO was a firm commitment underwriting by which eToys, the issuer, sold an entire allotment of shares to Goldman Sachs' underwriting syndicate which, in turn, sold the shares to the public (*see* 5 NY3d at 16-17). In a firm commitment underwriting, the underwriter bears the risk of loss on the unsold portion of the offering (*Securities & Exch. Commn. v Coven*, 581 F2d 1020, 1022 n 2 [2d Cir 1978]). "Because of their firm commitment obligations, underwriters will generally be conservative in pricing an issue" (1 Thomas Lee Hazen, Securities Regulation § 3.2 [6th ed]). Regardless of plaintiff's claims in this action, Goldman Sachs had an inherent interest in limiting its exposure by negotiating for a low offering price. Therefore, Goldman Sachs' interests were indisputably adverse to eToys' due to the nature of the firm commitment underwriting.

Plaintiff's briefs do not address the motion court's treatment of the prospectus by which eToys acknowledged that it had negotiated the offering price for its common stock with the representatives of the underwriters. According to the prospectus, eToys and the underwriters determined the IPO price after considering prevailing market conditions as well as other factors that included "eToys' historical performance, estimates of eToys' business potential and earnings prospects, an assessment of eToys' management and the consideration of the above factors in relation to market valuation in related businesses." Negotiation is a "consensual bargaining process in which the parties attempt to reach agreement on a disputed or potentially disputed matter" (Black's Law Dictionary 1064-1065 [8th ed 2004]). The word implies an arm's length exchange. Under the Securities Act of 1933 (15 USC § 77a *et seq.*), eToys was required to issue a prospectus that accurately disclosed the material facts of the IPO, including the manner by which the offering price was determined (*cf. Acacia Natl. Life Ins. Co. v Kay Jewelers*, 203 AD2d 40, 44 [1994]). A material inaccuracy would have exposed eToys to liability under the statute.

It is well settled that a fiduciary relationship ceases once the parties thereto become adversaries (*see Eastbrook Caribe, A.V.V. v Fresh Del Monte Produce, Inc.*, 11 AD3d 296, 297 [2004], *lv dismissed and denied* 4 NY3d 844 [2005]). A fortiori, a fiduciary

relationship cannot have been created between parties who have been adversaries throughout their transaction.[1]

In discovery responses, plaintiff acknowledged that eToys did not separately compensate Goldman Sachs for any alleged advisory services. Plaintiff also conceded that it was unaware of any financial advisory letter between eToys and Goldman Sachs. The following deposition testimony by eToys' chief executive officer (CEO), Edward C. Lenk, summarizes all that plaintiff offered to support its assertion that a fiduciary relationship had been created:

> "Q. Did you believe on May 19, 1999, that Goldman Sachs was giving you advice with the interest of eToys foremost in their mind [*sic*]?
>
> "A. Yes.
>
> "Q. Well you relied on them on May 19th?
>
> "A. We relied on them and . . . why did we rely on them?
>
> "Q. Yeah.
>
> "A. Because they're Goldman Sachs, for crying out loud, and they make a market and they take companies public. They completely control the process. They know how to do it. They get it done. They raise the money for us. They are the experts. They do this every day. We do this once in a life."

This evidence amounts to a mere expression of confidence in Goldman Sachs' expertise, wholly insufficient to create a "relationship of higher trust than would arise from the underwriting agreement alone" (5 NY3d at 20). "[A] fiduciary duty cannot be imposed unilaterally" (*Marmelstein v Kehillat New Hempstead: The Rav Aron Jofen Community Synagogue*, 45 AD3d 33, 37 [2007], *affd* 11 NY3d 15 [2008] [internal quotation marks omitted]). As recognized by the *EBC I* Court, an advisory relationship independent of an underwriting agreement may give rise to a fiduciary duty (*see* 5 NY3d at 20). Advice alone, however, is not enough to impose a fiduciary duty (*see Citibank, N.A. v Silverman*, 85 AD3d 463, 466 [2011]; *Flying J Fish Farm v Peoples Bank of Greensboro*, 12 So 3d 1185, 1191 [Ala 2008]).

---

1. Also, in applying *EBC I*, this Court reaffirmed the principle that the underwriter-issuer relationship is nonfiduciary (*see HF Mgt. Servs. LLC v Pistone*, 34 AD3d 82, 86 [2006]).

The *EBC I* Court found the complaint facially sufficient insofar as it alleged the parties "created their own relationship of higher trust beyond that which arises from the underwriting agreement alone, which required Goldman Sachs to deal honestly with eToys and disclose its conflict of interest—the alleged profit-sharing arrangement with prospective investors in the IPO" (5 NY3d at 22).

According to the complaint, Goldman Sachs' undisclosed conflicts of interests stemmed from its practice of allocating IPO shares to large institutional customers and private wealth investors for the purpose of enhancing future trading business with them. We find no issue of fact as to whether Goldman Sachs had undisclosed conflicts of interest on the basis of the following evidence given by eToys' executives:

- Lenk's testimony that he knew that Goldman Sachs did business with many large institutions and wealthy customers that would receive IPO allocations;

- testimony by director Tony A. Hung that he knew Goldman Sachs had to have its investor clients' interests at heart and that it would give allocations to institutional and private wealth customers;

- testimony by senior vice-president Stephen Paul that from his familiarity with the IPO process he "knew that underwriters allocate shares to institutions that generate significant commissions, and also to high-net-worth individuals affiliated with companies that may have been, or could become, investment banking clients and that this would happen with eToys' IPO"; and

- director Peter C.M. Hart's affidavit in which he states that based on his experience and observations over the course of his career in business and investments he was aware "that brokerage firms like Goldman Sachs allocate valuable resources to their most valued customers" and that a " 'hot' IPO allocation was a potentially valuable and scarce resource that Goldman Sachs would distribute among its valued customers, taking into account those customers' overall levels of business or potential business with Goldman Sachs."

■ On the basis of the foregoing testimony and affidavit, we find that the fraud cause of action was properly dismissed to the extent that it is based on Goldman Sachs' alleged failure to disclose its compensation arrangements with its customers. Based on the same proof, considered in light of the prospectus and the underwriting agreement, we find no issue of fact as to whether Goldman Sachs assumed a fiduciary duty to advise eToys with respect to its IPO price. We therefore need not consider whether such a duty was breached. Were we to consider the issue, we would find that Goldman Sachs met its burden of establishing that there was no breach.

In January 2002, four months before plaintiff commenced this action, Lenk gave the following testimony before the Securities and Exchange Commission (SEC):

> "A. Let me give you some basic math here. At the $20 price, the company was valued at $2.4 billion. So Goldman did—from our perspective, Goldman did a great job. A lot of times historically, banks have been criticized for underpricing IPO's. You cannot criticize our underwriters for underpricing our IPO. They got us, you know, a $2.4 billion valuation. They did a great job in getting the price up and maximizing the proceeds of the company which we were grateful and happy for. Because they gave us the proceeds to try and grow and achieve our vision.

> "Q. And was there ever a discussion of bringing the price of the offering above $20?

> "A. I don't recall that. From a tactical perspective, what the banks would tell us was they liked to price IPO's between ten and twenty dollars a share. They don't like to be below ten. They don't like to be above twenty. And, ideally, they want to be in that— and I don't know—you, know I think it's sort of a practice in the marketplace. They like to have them priced between ten and twenty.

> "You know, at ten to twelve, and moving up to eighteen and twenty and then twenty, we were raising double proceeds we initially thought. We were very happy strategically as a company to be able to have that extra cash. I don't recall us ever talking about going up to the higher price.

> "Q. Yeah.

"A. As a CEO, I was scared to death of just living up to the $20 price. I was scared to death. We got [*sic*] to try to justify valuing the company.

"There's only one thing worse than falling after the first day spike, it's falling below the IPO price. So how am I going to manage this company to be worth $2.4 billion, which was the $20 price.

"If we had talked about going higher, I would have said, No—I would have opposed that because I was already scared as it was."[2]

Lenk's testimony refutes the pivotal allegation that eToys had been duped into underpricing its IPO shares. Similar statements regarding Goldman Sachs' performance were made in the affidavits of four of eToys' directors and the depositions of CFO Schoch and two other senior officers. The dissent mistakenly relies on Lenk's deposition testimony that eToys would have likely priced its IPO shares higher if it "had full information as to the demand, the book, the conditions, what was possible, that [its] stock was going up that much." This testimony is demonstrably immaterial because the amended complaint sets forth no allegation that Goldman Sachs misrepresented or concealed any of the factors referenced by Lenk.[3] Where a claim is based upon misrepresentation, fraud or breach of trust, the circumstances constituting the wrong must be pleaded in detail (*see* CPLR 3016 [b]). Therefore, Lenk's deposition does not materially contradict his SEC testimony that he would have categorically opposed any increase in the offering price. Moreover, non-misleading omissions do not constitute fraud where there is no fiduciary relationship between the parties (*Eurycleia Partners, LP v Seward & Kissel, LLP*, 46 AD3d 400, 402 [2007], *affd* 12 NY3d 553 [2009]).

■ The remainder of the fraud cause of action was also properly dismissed. According to the complaint, Goldman Sachs

---

2. Lenk's fear was well-founded. According to the prospectus, eToys suffered losses of $2.3 million and $28.6 million in fiscal years 1998 and 1999 respectively. It was also undisputed that eToys never made a profit, it always operated at a loss, and in May 1999 its operating losses were projected to be $79.4 million by 2000 and $98 million by 2001. In addition, Lenk's testimony constitutes an admission by plaintiff, eToys' successor in interest (*see* Prince, Richardson on Evidence § 8-201 [Farrell 11th ed]).

3. As the dissent notes, plaintiff's expert opined that issuers generally rely on lead managers for advice with regard to IPO share prices. This opinion is irrelevant in light of Lenk's foregoing testimony that he was dead set against increasing the offering price.

made "materially misleading" statements "that its pricing represented 'the fair value of the Company's Common Stock.' " Such statements would have constituted nonactionable opinion providing no basis for a fraud claim (see *Mandarin Trading Ltd. v Wildenstein*, 16 NY3d 173, 178-179 [2011]). Plaintiff also alleges that Goldman Sachs fraudulently represented that it would allocate the IPO shares to long-term institutional investors when it instead allocated the shares to known "flippers."[4] Goldman Sachs' statement of material facts, served pursuant to rule 19-a of the Rules of the Commercial Division of the Supreme Court (22 NYCRR) § 202.70 (g), contained the statement that "[t]here was no promise made by Goldman Sachs regarding allocating only to investors who would be long-term holders." In support of the statement, Goldman Sachs cited Lenk's SEC testimony, his deposition and the depositions of CFO Schoch and director Hung, who was a member of eToys' Pricing Committee. Specifically, Lenk testified that eToys was generally aware that people would flip its stock for quick profits. Schoch testified that he did not remember any conversation in which it was said that "everybody that's in must stay in or they can't be in the I.P.O." Hung testified that he could recall no " 'promise' that those who received eToys allocations would hold them, no matter what the price did." In its counterstatement, plaintiff disputed the conclusion that no promise was made but did not refer to any promise made by Goldman Sachs. Instead, plaintiff cited to Lenk's testimony that eToys had a "preference that [its] shares not be placed with flippers." Plaintiff also cited Hung's testimony and Goldman Sachs' Wells submission to the extent that they essentially stated that attracting long-term investors was a goal of the IPO.[5] We deem Goldman Sachs' statement to be admitted by plaintiff inasmuch as the counterstatement is bereft of citations supporting its assertion that Goldman Sachs made a promise regarding allocations to only long-term holders (see *Moonstone Judge, LLC v Shainwald*, 38 AD3d 215, 216 [2007]). Accordingly, there is no triable issue of fact as to whether Goldman Sachs fraudulently misrepresented that it intended to issue the IPO shares to only

---

4. "Flippers" are those who quickly resell IPO shares in the aftermarket for large profits (see *EBC I*, 5 NY3d at 25 n 3 [Read, J., dissenting in part]).

5. A Wells submission is a written statement that may be submitted to the SEC by persons involved in SEC investigations who wish to set forth their interest and position with respect to the subject matter of the investigation (see *U.S. S.E.C. v Zahareas*, 374 F3d 624, 629 [8th Cir 2004]; 17 CFR 202.5 [c]).

long-term investors (*see generally Channel Master Corp. v Aluminium Ltd. Sales*, 4 NY2d 403, 406-407 [1958]).

We reject Goldman Sachs' alternative argument that the instant breach of fiduciary duty and fraud claims are preempted by federal securities laws. Goldman Sachs has made no showing of how plaintiff's claims would conflict with the SEC's regulatory scheme. We have considered the parties' remaining contentions and find them without merit.

Accordingly, the order of the Supreme Court, New York County (Eileen Bransten, J.), entered November 8, 2010, which, to the extent appealed from, granted the motion by defendant Goldman Sachs for summary judgment dismissing the complaint, should be affirmed, with costs.

ABDUS-SALAAM, J. (dissenting in part). I would modify, on the law and the facts, to reinstate the causes of action for breach of fiduciary duty and fraud to the extent that they are based on defendant's failure to disclose its compensation arrangements with its customers.

Although the majority concludes that there can be no fiduciary relationship between parties dealing at arm's length, the Court of Appeals acknowledged in *EBC I, Inc. v Goldman, Sachs & Co.* (5 NY3d 11 [2005]) that even though an issuer and underwriter have an arm's length commercial relationship, there may also be an advisory relationship independent of the underwriting agreement that creates a fiduciary duty.

While the majority states that it has examined the scope of the underwriting agreement to determine whether the parties had a fiduciary relationship that transcended the agreement, the majority's analysis essentially hinges solely on the language of the agreement, which concededly does not set forth a fiduciary relationship. This analysis runs afoul of the Court of Appeals' recognition that an advisory relationship independent of the underwriting agreement would be demonstrated upon proof that "eToys was induced to and did repose confidence in Goldman Sachs' knowledge and expertise to advise it as to a fair IPO price and engage in honest dealings with eToys' best interest in mind" (5 NY3d at 20). Because the record presents proof on this very subject, the majority improperly engages in issue determining rather than issue finding when it concludes as a matter of law that there was no fiduciary relationship (*see generally Sillman v Twentieth Century-Fox Film Corp.*, 3 NY2d 395, 404 [1957]; *Martin v Citibank, N.A.*, 64 AD3d 477, 478 [2009]).

Defendant's witness Lawton Fitt, the eToys "deal captain," testified that she advised plaintiff about the pricing of the initial public offering (IPO). In particular, Fitt testified:

"[F]rom an advisory standpoint, the role that I was in was as adjunct, if you will, to the investment banking role. I was one of the advisors to the company, and that is an unusual, unique position, if you think in terms of the equity function, where the equity function is largely dealing with the investor community, not so much the investment banking community or the corporate community."

This buttresses the testimony of plaintiff's chairman and chief executive officer, Edward Lenk, that Goldman Sachs gave eToys advice on the pricing of the IPO, upon which plaintiff relied. Thus, Lenk's testimony about his reliance on defendant's advice is not merely an expression of confidence in defendant's expertise, as found by the majority, but confirmation of Fitt's testimony that she was the expert on pricing and was the force behind the ultimate decision to price the shares at $20.

That plaintiff and defendant negotiated the price does not negate plaintiff's proof that defendant was advising plaintiff and that plaintiff was relying on defendant's expertise in pricing. The majority's suggestion that plaintiff is seeking to unilaterally impose a fiduciary duty is belied by evidence in this record that defendant was acting as an advisor on the IPO share price, that defendant induced plaintiff to rely on this advice, and that plaintiff did so rely, thus creating a relationship of higher trust independent from the underwriting agreement (*see EBC I*, 5 NY3d at 20; *Pergament v Roach*, 41 AD3d 569, 571 [2007]; *Xpedior Creditor Trust v Credit Suisse First Boston (USA) Inc.*, 399 F Supp 2d 375, 385 [SD NY 2005]; *compare HF Mgt. Servs. LLC v Pistone*, 34 AD3d 82, 85 [2006] [no evidence that the underwriter acted as an " 'expert advisor on market conditions' "]).*

The majority's conclusion that there can be no fiduciary duty because the parties have adverse interests echoes the observations of the dissent in *EBC I* where Judge Read wrote:

---

* The motion court's observation that it was plaintiff's decision to rely on defendant's expertise rather than to utilize its own resources, misses the mark. The Court of Appeals recognized in *EBC I* that the underwriter's role as advisor creates and also limits the underwriter's fiduciary duty. That plaintiff could have also utilized other resources to help set the IPO price is not dispositive. As the motion court properly noted in another lawsuit, with application here, where "the parties are in a fiduciary relationship, whether [plaintiff] could reasonably rely on [defendant's] misrepresentations generally

"How may a buyer ever owe a duty of the highest trust and confidence to a seller regarding a negotiated purchase price? The interests of a buyer and seller are inevitably not the same. Indeed, it is a longstanding principle of contract law that a buyer may make a binding contract to buy something that it knows its seller undervalues" (5 NY3d at 26).

However, Judge Read's concern about recognizing the viability of a fiduciary relationship was implicitly rejected by the majority when it held that there can be a limited fiduciary duty separate and apart from the underwriting agreement.

The majority's citation to *Eastbrook Caribe, A.V.V. v Fresh Del Monte Produce, Inc.* (11 AD3d 296 [2004], *lv dismissed and denied* 4 NY3d 844 [2005]) is inapt, as it merely stands for the straightforward proposition that once parties become adversaries in litigation, any fiduciary relationship between them ceases. Nor does this Court's holding in *HF Mgt. Servs. LLC v Pistone* (34 AD3d 82 [2006]) support dismissal of the complaint here, as suggested by the majority. To the contrary, in *HF Mgt.*, we *contrasted* the situation in that case to that in *EBC I*, noting that there was "no indication or suggestion that . . . [the underwriter of the IPO] acted as an 'expert advisor on market conditions' . . . in the same way that Goldman Sachs apparently advised eToys" (34 AD3d at 85).

The record evidence is also sufficient to raise a triable issue of fact as to whether the underwriter, by failing to disclose its alleged conflicts of interest with respect to the IPO pricing, breached any fiduciary duty. Again, the majority is improperly engaging in issue determining when it concludes that even assuming there was a fiduciary relationship, Goldman Sachs has established there was no breach. Lenk testified before the Securities and Exchange Commission (SEC) in 2002, prior to commencement of this action, that he thought Goldman Sachs did a great job on the IPO and that he would have been opposed to any suggestion by defendant that the IPO be priced higher. Years later, however, based upon additional information that was not known to him at the time of his SEC testimony, he testified in this lawsuit as follows:

"I believe that if we had full information as to the

raises an issue of fact precluding summary disposition (*Aris Multi-Strategy Offshore Fund, Ltd. v Devaney*, 26 Misc 3d 1221[A], 2009 NY Slip Op 52738[U], *7 [2009, Bransten, J.]).

demand, the book, the conditions, what was possible, that we—our stock was going to go up that much, we would have very likely priced our IPO higher, and we would have had more proceeds, and it would have helped give us a stronger balance sheet, giving us a significant chance of surviving as a company."

The majority cites Lenk's testimony before the SEC and completely disregards his testimony in this action as immaterial.

The majority also improperly ignores and disregards, as irrelevant, pertinent testimony by plaintiff's expert, including the following:

"In addition to a contractual relationship concerning the underwriting (i.e. purchase) and re-sale of the issuer's (here eToys) stock, it is also a professional relationship between the issuer, as advisee and the lead-manager, as advisor.[1]

"Issuers (like eToys) must necessarily rely on lead-managers (like Goldman) for advice all the way through the IPO process but *particularly*, and *most importantly*, with regard to the ultimate price per share of the IPO. Issuers simply do not have the requisite experience and expertise to make the pricing decision on their own. Recommending a specific offering price is the single most important aspect of a lead-manager's job."

---

"[1]Of note, this relationship must co-exist [*sic*] with the ongoing relationships the lead-manager has with potential purchasers of the eToys IPO" (emphasis in original).

In sum, this record presents triable issues of fact as to whether there was a fiduciary relationship between the parties, and, if so, whether defendant breached that duty—issues that should be resolved by the trier of fact.

Finally, although plaintiff has not raised any issue of fact regarding its contention that defendant misrepresented that it intended to issue the IPO shares to only long-term investors, there is evidence that plaintiff relied on defendant's advice about the pricing of the IPO without defendant having disclosed its compensation arrangements with its customers—such as its

alleged strategy to use the "trade up value" of underpriced IPOs to receive, as quid pro quos, increased brokerage commissions and other business from recipients of IPO allocations. Accordingly, that portion of the fraud cause of action should be reinstated and resolved by the trier of fact.

ANDRIAS, J.P., FRIEDMAN and RENWICK, JJ., concur with DE-GRASSE, J.; ABDUS-SALAAM, J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered November 8, 2010, affirmed, with costs.