**Ben R. BACKUS, et al., Plaintiffs,**

v.

**CONNECTICUT COMMUNITY BANK, N.A., owner of Westport National Bank, Defendant.**

Civ. No. 3:10–CV–798.

United States District Court, D. Connecticut.

March 30, 2011.

David S. Golub, Jonathan M. Levine, Silver, Golub & Teitell, Stamford, CT, for Plaintiffs.

Jenny R. Chou, Jonathan M. Freiman, Joseph C. Merschman, New Haven, CT,

Scott D. Corrigan, Wiggin & Dana, LLP, New York, NY, for Defendant.

### RULING ON MOTIONS FOR JUDGMENT ON THE PLEADINGS AND TO REMAND

PETER C. DORSEY, District Judge.

This action arises out of the infamous Ponzi scheme perpetrated by Bernard L. Madoff. Plaintiffs Ben R. Backus, William S. Sklar, and a number of other individuals bring suit against Defendant Connecticut Community Bank, N.A. ("CCB"), the owner of Westport National Bank ("WNB"). WNB, a bank that served as custodian of Plaintiffs' retirement accounts, invested Plaintiffs' assets with Bernard L. Madoff Investment Services ("BLMIS") until Madoff's fraud was uncovered. Plaintiffs allege, *inter alia,* that WNB breached its custodian agreements and acted fraudulently by failing to safeguard Plaintiffs' assets from theft and by misrepresenting the value of Plaintiffs' accounts, the extent to which it was holding Plaintiffs' assets, and the due diligence performed on BLMIS' investments. The following causes of action are alleged: breach of contract; negligence; breach of fiduciary duty; violation of the Connecticut Unfair Trade Practices Act, CONN. GEN. STATS. § 42–110(a) *et seq,* ("CUTPA"); theft; and fraud.

Plaintiffs commenced this lawsuit in Connecticut Superior Court on July 8, 2009. CCB removed the case to federal court pursuant to the removal provision of the Securities Litigation Uniform Standards Act ("SLUSA"). On December 22, 2009, this Court dismissed all of Plaintiffs' class claims on the basis that they were preempted by SLUSA, and granted Plaintiffs' motion to remand their individual claims to state court. Plaintiffs then filed the second amended complaint in Connecticut Superior Court on February 19, 2010. On March 30, 2010, CCB moved to consolidate this case with *Sklar v. Connecticut Community Bank, N.A.,* another case filed in Connecticut Superior Court by Plaintiffs' counsel that raised issues nearly identical to those raised in *Backus.* In May 2010, the Connecticut Superior Court granted the motion to consolidate, after which CCB removed the consolidated case to federal court pursuant to SLUSA's removal provision. The subject of the instant ruling is CCB's Motions for Judgment on the Pleadings and Plaintiffs' Motions to Remand. For the reasons stated herein, Defendant CCB's Motions for Judgment on the Pleadings [Doc. Nos. 12, 29] are **granted,** and Plaintiffs' Motions to Remand [Doc. Nos. 20, 30] are **denied.**

## I. BACKGROUND [1]

The named Plaintiffs are a group of at least fifty-one individuals who maintained individual custodial accounts with WNB or were trustees, owners or members of education savings accounts, individual retirement accounts, or pension and profit-sharing plans that maintained custodial accounts at WNB. *See Backus* SAC ¶¶ 1–26; *Sklar* TAC ¶¶ 1–24. Defendant CCB is a nationally chartered bank that owns and operates offices in Connecticut, including WNB. *Backus* SAC ¶ 27; *Sklar* TAC ¶ 25.

At various times prior to December 2008, each of the Plaintiffs, either individually or as trustees, owners or members of pension, profit-sharing or retirement plans or educational savings accounts, entered

---

**1.** The following facts are taken from the *Backus* second amended complaint ("*Backus* SAC") and *Sklar* third amended complaint ("*Sklar* TAC") and accepted as true for purposes of this motion.

into Custodian Agreements with WNB for the investment of their assets, which provided in relevant part:

1. It is the Principal's intent to transfer cash or cash equivalents to the Bank.[2] The Bank shall accept such property from the Principal and the Bank shall invest all such cash and cash equivalents held hereunder, and any interest, dividend or other income earned from property held by the Bank hereunder, in the Bank's deposit money market account until the Bank transfers the funds to Bernard L. Madoff Investment Services ("BLMIS"), as contemplated in Paragraph 2 hereof.

2. The Principal hereby authorizes the Bank to transmit to BLMIS all funds received by the Bank from the Principal to the extent that the transmission of such funds is practical and acceptable to BLMIS. The Bank is hereby authorized and directed, in its capacity as a custodian hereunder for the benefit of the Principal, to enter into an agreement with BLMIS under which BLMIS will have full discretionary authority as to manner in which funds are invested. The Principal has chosen BLMIS to receive and to invest the Principal's funds, and has not relied on the Bank in choosing to give BLMIS full discretionary authority. It is understood and acknowledged that funds to the Principal which are transmitted to BLMIS will be transmitted together with funds of other persons or entities for whom the Bank is acting in a similar capacity; that the investment account of BLMIS will be under the name "Westport National Bank"; that the funds of the Principal transmitted to BLMIS will be grouped with funds of other persons or entities for investment with BLMIS; [and] that the Bank has no authority or ability to direct or oversee in any manner the discretionary investments made by BLMIS . . .

3. The Bank will also follow such reasonable written instructions which the Principal may deliver to the Bank at any time, or from time to time, including to request that BLMIS return assets of the Principal to the Bank and for the Bank to remit cash or cash equivalents to the Principal. However, unless the Bank receives such written directions, the Bank will invest all funds as described in Sections 1 and 2 of this Custodian Agreement.

4. The Bank shall maintain adequate records indicating the ownership by the Principal of investments with BLMIS and held by the Bank as custodian for the Principal. The Principal and the Bank also acknowledge that the Principal has entered into an agreement with PSCC Services Inc. ("PSCCSI"), for services to be provided by PSCCSI with respect to Principal's investments made by BLMIS. The Bank is authorized and directed to coordinate its record keeping with that provided by PSCCSI. The Bank shall serve as custodian hereunder only in the event such agreement between PSCCSI remains in effect. The Bank is further authorized and directed to pay to PSCCSI from the custodial account of Principal established hereunder an annual fee for services provided by PSCCSI an amount equal to .010 of the average assets (determined on an annual basis) held by the Bank under this Custodian Agreement, plus .002 of the amount of each transaction effected by BLMIS on behalf of the Principal with a maximum of .025 of average assets. . . .

---

**2.** "The principal" refers to the account holder, and "the Bank" refers to WNB.

5. The Bank shall render at least annually statements reflecting the property held by it as custodian hereunder. Such statements shall be rendered to the Principal, or its designated representative. . . .

*Backus* SAC ¶ 28, Ex. A.

Pursuant to the Custodian Agreements, WNB was required to: (1) maintain adequate records indicating ownership of each account holder's investments with the investment manager BLMIS; (2) provide each account holder with an annual account statement setting forth the property held by WNB as custodian; (3) charge each account holder annual fees for its custodial services based on the average value of the assets held by WNB for that account holder; and (4) pay PSCCSI annual fees directly from each account holder's account based in part on each transaction effected by BLMIS on behalf of the account holder.[3] *Id.* ¶¶ 30–31, 33–34; *Sklar* TAC ¶¶ 28–32. By serving as custodian of the accounts, WNB was also required to safeguard account holders' assets from theft or other misfeasance by BLMIS. *Backus* SAC ¶ 35; *Sklar* TAC ¶ 33.

Plaintiffs argue that WNB acted negligently and in breach of the Custodian Agreements by failing to: (1) maintain custody of investments made by BLMIS on Plaintiffs' behalf; (2) verify BLMIS' investment of their assets or perform other reasonable due diligence; (3) accurately ascertain the fair market value of their retirement accounts and provide Plaintiffs with accurate annual account statements; and (4) maintain adequate records indicating ownership by each Plaintiff of invest-

ments made by BLMIS. *Backus* SAC ¶¶ 38–40, 43; *Sklar* TAC ¶¶ 36–37, 41–47. Plaintiffs also claim that WNB charged them fees for itself and PSCCSI that were not calculated on the basis of the investments held by WNB for each account holder or the transactions effected by BLMIS. *Backus* SAC ¶¶ 41–42, 47–48; *Sklar* TAC ¶¶ 39–40, 48. As a result of WNB's breach of contract and negligence, BLMIS was able to steal Plaintiffs' retirement account funds. *Backus* SAC ¶ 40, *Sklar* TAC ¶ 38.

Plaintiffs also allege that WNB owed a fiduciary duty to them by virtue of its "superior knowledge, skill and expertise in providing banking trust services, including custodial services for retirement accounts." *Backus* SAC ¶ 51; *Sklar* TAC ¶ 49. WNB had a duty to take custody of Plaintiffs' assets invested by BLMIS or, at a minimum, to verify the existence of such assets, as well as "to undertake reasonable due diligence to accurately ascertain and report the fair market value of plaintiffs' accounts and the transaction undertaken by plaintiffs' investment manager [BLMIS] to determine the fees charged and collected from plaintiffs' accounts." *Backus* SAC ¶¶ 55–56; *Sklar* TAC ¶ 54.

In addition to WNB's alleged failure to safeguard their assets, accurately assess its and PSCCSI's fees, and perform reasonable due diligence on BLMIS' investment of Plaintiffs' assets, Plaintiffs allege that WNB made a number of misrepresentations regarding its custody of their assets. WNB represented that it was holding shares of BLM 1 and BLM 2 in Plaintiffs' custodial accounts,[4] that it was

---

**3.** The complaints do not mention BLMIS by name, and instead refer to Plaintiffs' "investment manager." However, the *Backus* SAC attaches the Custodian Agreement as an exhibit, and the Custodian Agreement makes clear that BLMIS is the investment manager referenced in the complaint.

**4.** The complaints do not define BLM 1 and BLM 2. They simply state that BLM 1 was "for tax-qualified employee benefit plans" and that BLM 2 was "for IRAs," and that the annual account statements sent to Plaintiffs represented the buying and selling of shares in these entities. *Backus* SAC ¶ 59; *Sklar*

purchasing and selling shares of BLM 1 and BLM 2 for their accounts, that said shares had a stated unit market value, and that their accounts had "Total Equities" of a stated market value, when in fact BLM 1 and BLM 2 did not exist and WNB was not holding any of plaintiffs' assets in their custodial accounts. *Backus* SAC ¶¶ 59–60; *Sklar* TAC ¶¶ 57–58. Despite representing otherwise, "WNB knew that it had no securities or other assets in its possession as custodian of plaintiffs' retirement accounts." *Backus* SAC ¶ 61; *Sklar* TAC ¶ 58. Because "WNB knew it had no permissible basis ... for charging [Plaintiffs] an annual percentage fee for itself or PSCC[SI]," it "falsely represented that it was holding shares of BLM 1 and BLM 2 in plaintiffs' accounts as a deceptive basis for charging plaintiffs unjustified fees for itself and its business partner" PSCCSI. *Backus* SAC ¶¶ 62, 64; *Sklar* TAC ¶¶ 62. WNB therefore "intentionally misappropriated to itself (and to it business partner, PSCC[SI] ) funds rightfully belonging to plaintiffs." *Backus* SAC ¶ 73; *Sklar* TAC ¶ 71.

In sum, "WNB's conduct ... in failing to conduct due diligence, in failing to take custody of the assets in plaintiffs' retirement accounts or take other measures to verify the existence of such assets, in leading plaintiffs to believe that their assets were secure and fairly valued, and in charging and collecting fees from plaintiffs' retirement accounts on the basis of knowingly false representations, breached WNB's fiduciary duty to plaintiffs" and is the basis for Plaintiffs' claims of fraud. *Backus* SAC ¶ 66; *Sklar* TAC ¶ 64. As a result of WNB's fraud and breach of its duties, BLMIS was able to steal Plaintiffs' assets. *Backus* SAC ¶ 40.

TAC ¶ 57. According to the account statements attached the complaints, it appears that

## II. STANDARD OF REVIEW

### A. Motion for Judgment on the Pleadings

Pursuant to Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." A motion for judgment on the pleadings is decided on the same standard as a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). The purpose of a motion to dismiss pursuant to Rule 12(b)(6) "is merely to assess the legal feasibility of the complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 779 (2d Cir.1984) (*quoting Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980)). In ruling on a motion under Fed.R.Civ.P. 12(b)(6), the court may consider only "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The district court may dismiss a claim under Fed.R.Civ.P. 12(b)(6) only if the plaintiff's factual allegations are not sufficient "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Thus, to survive a Rule 12(c) motion, plaintiffs' complaint "must contain

BLM 1 and BLM 2 purported to be BLMIS entities that held securities.

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).

## B. Motion to Remand

■ In determining the propriety of removal, the party asserting jurisdiction "bears the burden of showing the case is properly before the court." *Lupo v. Human Affairs Int'l, Inc.,* 28 F.3d 269, 274 (2d Cir.1994). "Federal courts construe the removal statute narrowly, resolving any doubts against removability ..." *Id.* See also *Somlyo v. J. Lu–Rob Enters., Inc.,* 932 F.2d 1043, 1045–46 (2d Cir.1991) ("In light of the congressional intent to restrict federal court jurisdiction, as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any doubts against removability.").

## III. DISCUSSION

■ WNB argues that Plaintiffs' claims must be dismissed because they are preempted by SLUSA. SLUSA states in relevant part:

No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by an private party alleging—

(A) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or

(B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. 77p(b). Thus, SLUSA mandates dismissal of claims that meet the following criteria: (1) a covered class action (2) brought under state statutory or common law (3) alleging a misrepresentation or omission of a material fact (4) in connection with the purchase or sale (5) of a covered security. If SLUSA preempts a claim, that claim must be dismissed; if it does not, the claim must be remanded to state court. The parties dispute whether this is a covered class action and whether it is in connection with the purchase or sale of a covered security. Plaintiffs also argue that, even if their other claims are preempted, their breach of contract and negligence claims cannot be dismissed because they do not assert misrepresentations or omissions of material fact. Each of these arguments will be addressed in turn.

## A. "Covered Class Action" Element

A "covered class action" under SLUSA includes: "any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which—(I) damages are sought on behalf of more than 50 persons; and (II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose." 15 U.S.C. § 78bb(f)(5)(B)(ii). At least fifty-one individuals are named as Plaintiffs in this case, which consolidated *Backus* with *Sklar,* and Plaintiffs do not dispute that the consolidated lawsuits involve common questions of law or fact.

■ In arguing that this case does not meet the definition of a covered class action, Plaintiffs claim that, because sixteen Plaintiffs invested with WNB through four different profit-sharing plans, the "entity exception" of SLUSA mandates that the profit-sharing plans, not each plan's members, be counted for purposes of determining whether there are more than "50 persons." The "entity exception" to SLUSA states that "a corporation, investment company, pension plan, partnership, or other

entity shall be treated as one person or prospective class member, but only if the entity is not established for purposes of participating in this action." 15 U.S.C. § 78bb(f)(5)(D). According to the entity exception, in a case brought by a corporation, investment company, pension plan, partnership or other entity, the entity counts as one person regardless of how many people have invested with the entity or may benefit from the lawsuit.

Here, however, no pension plan or other entity is a plaintiff to the action. Rather, the sixteen Plaintiffs at issue are members or owners of pension plan accounts who have sued CCB individually and are seeking damages for themselves only. *See, e.g., Backus* SAC ¶ 2 (Plaintiff Kimberly Backus "is a member and owner of a beneficial interest in the W.R. Johnson Co. Pension and Profit–Sharing Fund" and "brings this action to recover the losses to *her interest* in the Plan") (emphasis added); *Sklar* TAC ¶ 15 ("Plaintiff John F. Godfrey ... is a member and owner of a beneficial interest in the Pacific Plumbing and Heating Supply Co. Profit–Sharing Plan" and "brings this action to recover the losses to *his interest* in the Plan") (emphasis added). By its own terms, the entity provision applies only to the entities themselves, not to individuals who have a financial interest in the entity. Therefore, the sixteen plaintiffs in *Backus* and *Sklar* who invested with WNB through four different profit-sharing plans are counted as sixteen persons in determining whether this is a covered class action. As Plaintiffs do not dispute that an additional thirty-eight plaintiffs are properly counted as thirty-eight persons, the total number of persons identified as plaintiffs in this lawsuit is at least fifty-one—which is the minimum amount necessary to qualify as a covered class action under SLUSA.

■ Plaintiffs also argue that SLUSA should not apply here because *Backus* and *Sklar* were consolidated without their consent. On March 30, 2010, CCB filed a motion to consolidate *Backus* and *Sklar* in state court, which Plaintiffs objected to on the grounds that CCB was using consolidation in order to meet the fifty-one person threshold needed to invoke SLUSA preemption. CCB admitted in oral argument that, should its motion be granted, it would remove the consolidated action to federal court and seek dismissal under SLUSA. The state court judge nevertheless granted the motion to consolidate because of the virtually identical issues raised in the cases.

Plaintiffs' proposed limitation of the "covered class action" provision to circumstances where plaintiffs do not object to consolidation would read language into the "covered class action" provision that does not exist. The provision states that a "covered class action" includes "any group of lawsuits filed in or pending in the same court and involving common questions of law or fact [where] ... the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose." 15 U.S.C. § 78bb(f)(5)(B)(ii). The express language does not limit the provision's applicability to lawsuits joined or consolidated without a plaintiff's objection, so this Court will not interpret the provision to contain any such limitation.

Even if the statutory language were not clear, Congress' intent was that SLUSA "be interpreted broadly to reach mass actions *and all other procedural devices that might be used to circumvent the class action definition.*" S.Rep. No. 105–182, at 8 (1998) (emphasis added). The Senate Banking Committee report on SLUSA states:

> The Committee does not intend for the bill to prevent plaintiffs from bringing

bona fide individual actions simply because more than fifty persons commence the actions in the same state court against a single defendant. However, the provisions of the bill would apply where the court orders that the suits be joined, consolidated, or otherwise proceed as a single action at the state level. *Id.* at 7–8. *See also In re WorldCom Sec. Litig.,* 308 F.Supp.2d 236, 247 (S.D.N.Y. 2004) (holding that "this passage underscores congressional intent to preempt state court litigation whenever separately filed suits are consolidated, even when the suits are 'bona fide individual actions' "). The situation presented here, which involves two nearly identical lawsuits that were filed separately in state court in order to circumvent the fifty-one person requirement for SLUSA preemption, is precisely what Congress sought to prevent in enacting its definition of "covered class action."

Because this case meets the definition of a "covered class action" set forth in 15 U.S.C. § 78bb(f)(5)(B)(ii), the Court will next determine whether the "in connection with" element is met.

**B. "In Connection With" Element**

 SLUSA's "in connection with" element is satisfied when a fraudulent scheme and a securities transaction "coincide." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,* 547 U.S. 71, 85, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006). The " 'coincide' requirement is broad in scope" and is met when claims " 'turn on injuries caused by acting on misleading investment advice'-that is, where plaintiff's claims 'necessarily allege,' 'necessarily involve,' or 'rest on' the purchase or sale of securities." *Romano v. Kazacos,* 609 F.3d 512, 522 (2d Cir.2010) (quoting *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 395 F.3d 25, 48, 50 (2d Cir.2006); *vacated on other*

grounds by 547 U.S. 71, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006)). Because plaintiffs may seek to avoid SLUSA preemption through artful pleading, courts "must look beyond the face of the complaint to analyze the substance of the allegations made." *Dabit,* 395 F.3d at 34.

 In *Backus v. Connecticut Community Bank, N.A.,* Civ. No. 3:09–CV–1256, 2009 WL 5184360 (D.Conn. Dec. 23, 2009) (hereinafter *"Backus I"*), this Court dismissed all class claims on the grounds that the claims as presented alleged a misrepresentation or omission in connection with the purchase or sale of a security, and thus were preempted by SLUSA. The *Backus I* complaint alleged that the plaintiffs had established accounts at WNB for the purpose of pooling their retirement funds in a collective investment account to be placed under BLMIS' investment management and to be used for the purchase and sale of securities by Madoff for the benefit of account holders. *Id.* at *1. The collective investment account invested in shares of BLM 1, a BLMIS entity supposedly holding securities for tax-qualified retirement plans, and BLM 2, a BLMIS entity supposedly holding securities for IRA accounts. *Id.* at *2. In reality, however, BLM 1 and BLM 2 did not exist, yet the plaintiffs received annual statements from WNB purporting to detail the activity, holdings, and value of their accounts. *Id.* The complaint alleged that WNB misrepresented its role as custodian and did not safeguard the account holders' assets and security holdings even though it was required to do so, which allowed BLMIS to steal these assets. This Court found that the "in connection with" requirement was met because, *inter alia,* the purpose of the relationship between the *Backus I* plaintiffs and WNB was the investment of the plaintiffs' assets in securities, WNB charged fees based on the value of securi-

ties it purportedly but did not actually hold, and WNB's fraudulent statements induced the *Backus I* plaintiffs to keep their investments with WNB until Madoff's Ponzi scheme was revealed. *Id.* at *6, *8.

The *Backus* SAC and the *Sklar* TAC remove many of the details contained in the *Backus I* complaint in an apparent effort to avoid SLUSA preemption. For instance, they steer clear of mentioning BLMIS or Madoff by name, instead using the term "investment manager," although the Custodian Agreement makes clear that the "investment manager" is BLMIS. The *Backus I* complaint also details the role played by PSCCSI in advising account holders to enter into a custodial arrangement with WNB in order to invest their assets with Madoff, while the complaints at issue here barely mention PSCSSI. The crux of the allegations, however, remains the same; both the *Backus I* complaint and the two complaints at issue here allege that WNB misrepresented that it was holding all investments made by Madoff with account holders' funds, that WNB charged account holders fees based on investments and securities it was purportedly but not actually holding, and that WNB's misrepresentations and breach of its custodial obligations allowed Madoff to steal account holders' funds. The allegations have not changed sufficiently to alter the SLUSA analysis.

What has changed since this Court dismissed the *Backus I* complaint in December 2009, however, is the number of cases in this circuit analyzing SLUSA preemption in the context of middlemen who placed investors' assets with BLMIS and are now being sued for fraud. In *In re Beacon Assocs. Litig.*, 745 F.Supp.2d 386 (S.D.N.Y.2010), investors alleged that the Beacon fund, a feeder fund that invested

with BLMIS, misrepresented in its offering memoranda the extent to which it would perform due diligence on and monitor BLMIS. *Id.* at 430. In holding that SLUSA preempted the state law claims, the court found that the fund's misrepresentations about the investors' limited partnership interests were "in connection with" securities because "the objective of the fund was to manage Plaintiffs' investment using a strategy that inevitably included the purchase and sale of covered securities." *Id.* Similarly, in *Newman v. Family Mgmt. Corp.*, 748 F.Supp.2d 299 (S.D.N.Y.2010), the court analyzed whether investors' state law claims against a subfeeder fund, which invested the investors' assets in a feeder fund that in turn invested in BLMIS, were preempted by SLUSA. The sub-feeder fund's operating memorandum stated that it would invest assets through other investment vehicles, such as hedge funds, rather than trading on its own. *Id.* at 303–05. Because the objective of the fund was to manage the plaintiffs' investments by investing in funds that purchased and sold covered securities, the court found that the sub-feeder fund's alleged misrepresentations were in connection with the purchase or sale of a security. *Id.* at 312–13. *See also Barron v. Igolnikov*, No. 09 Civ. 4471(TPG), 2010 WL 882890, at *5 (S.D.N.Y. Mar. 10, 2010) (holding that claims brought by investors who held limited partnership interests in funds-of-funds, which invested with Madoff indirectly by allocating a portion of their assets to four feeder funds that had direct accounts with Madoff, were preempted by SLUSA because Madoff's "fraudulent scheme was in connection with the trading in the nationally listed securities in which Madoff claimed to be engaged").[5]

---

**5.** Courts in other circuits have adopted a sim- ilar position to that taken in *Beacon, Newman,*

At least one court in this circuit, however, has come to the opposite conclusion. In *Anwar v. Fairfield Greenwich Ltd.*, 728 F.Supp.2d 372 (S.D.N.Y.2010), the court refused to dismiss state law claims brought on behalf of investors who invested in four funds, which in turn invested the majority of the investors' assets with BLMIS, on the grounds that any purported purchases of securities by Madoff were too far removed from the plaintiffs' fund investments to be preempted under SLUSA. *Id.* at 398–99. The court found that the funds "were not a cursory, pass-through entity" to BLMIS, and that there were "multiple layers of separation between whatever phantom securities Madoff purported to be purchasing and the financial interests Plaintiffs actually purchased." *Id.* at 399. *See also Pension Comm. of the Univ. of Montreal Plan v. Banc of America, LLC*, 750 F.Supp.2d 450, 453–55 (S.D.N.Y.2010) (holding that claims by purchasers of shares of hedge funds against the funds' administrator for allegedly overvaluing the funds were not in connection with the purchase or sale of securities because they only concerned the valuation of the hedge funds and plaintiffs' shares in those funds).

In the past year, the Second Circuit has also weighed in on scope of the phrase "in connection with" in the context of SLUSA preemption. In *Romano*, 609 F.3d at 512, the plaintiffs consulted with retirement specialists at defendant Morgan Stanley and, in reliance on the retirement specialists' advice, elected to retire early and invest their retirement payouts in securities through Morgan Stanley. When the value of their investment portfolios declined sharply, the plaintiffs sued Morgan Stanley in state court alleging state law fraud-based claims, and Morgan Stanley removed the case to federal court based on SLUSA's removal provision. In arguing that SLUSA did not preempt their claims, the plaintiffs asserted that their claims involved only financial and retirement planning advice, which was attenuated from their eventual purchase of securities. The Second Circuit rejected this argument, holding that "this is a case where defendants' alleged misrepresentations induced [plaintiffs] to retire early, receive lump sum benefits, and invest their retirements savings with defendants, where the savings were use to purchase covered securities.... Because both the misconduct complained of, and the harm incurred, rests on and arises from securities transactions, SLUSA applies." *Id.* at 524. Even though there was an eighteen-month gap between the date on which Morgan Stanley advised the plaintiffs and the date the investment in securities occurred, the court found that "this was a string of events that were all intertwined." *Id.*

In arguing that WNB's fraud is disconnected from securities transactions, Plain-

---

and *Barron*. In *Tuttle v. Sky Bell Asset Mgmt.*, No. C 10–03588(WHA), 2010 WL 4807093 (N.D.Cal. Nov. 19, 2010), owners of limited partnership interests sued the defendant partnerships for misrepresenting the extent to which the partnership would diversify investment strategies and would conduct due diligence on BLMIS. The court held that, because "the gravamen of the instant complaint is that there were misrepresentations that plaintiffs' money was to be invested in massively diversified investments, when in fact all of the money was funneled into funds-of-funds

that investment in Ponzi schemes," SLUSA preempted the state law claims. *Id.* at *6. *See also Daniels v. Morgan Asset Mgmt.*, 743 F.Supp.2d 730, 738 (W.D.Tenn.2010) (holding that investors' state law claims against their investment advisory firm, which invested in funds that in turn invested in illiquid securities backed by mortgages, were preempted by SLUSA because the substance of claims—that the firm failed to disclose a conflict of interest with the funds—was in connection with the purchase or sale of securities).

tiffs assert that WNB's misrepresentations are limited to its calculation of annual account fees. WNB allegedly misrepresented the amount of assets it was holding so that it could correspondingly inflate its fees, which were tied to the amount of assets it was holding for each account holder. See Pls.' Mem. at 32 (WNB's fraud is based on its "calculation of annual account fees despite its knowledge that it was not holding any securities as custodian for plaintiffs"). Because the false statements pertain to annual account fees as opposed to transaction-based fees, Plaintiffs allege that WNB's fraud only has a tangential relationship to Madoff's security transactions. *Id.*

 This Court is not persuaded by Plaintiffs' characterization of their claims. WNB's alleged misrepresentations extend beyond the calculation of fees to whether it was holding and safeguarding the securities that BLMIS purported to be trading with Plaintiffs' assets. *See Backus* SAC ¶¶ 59–60. As the Supreme Court made clear in *Dabit*, 547 U.S. at 89, 126 S.Ct. 1503, a plaintiff's status as a holder—rather than a buyer or seller—"does not determine whether a complaint alleges fraud 'in connection with the purchase or sale' of securities." *Dabit* requires dismissal even when a securities holder "alleges a diminu-

tion in the value of securities without personally engaging in a purchase or sale." *Fisher v. Kanas*, 288 Fed.Appx. 721, 723 (2d Cir.2008).

Moreover, WNB's misrepresentations concerning the extent to which it was holding Plaintiffs' assets and the value of said assets led Plaintiffs to believe that their assets were secure. *Id.* ¶¶ 65–66. "Each of the plaintiffs relied, to his or her financial detriment, on WNB's false representations about the assets being held by WNB in his or her accounts and the value of the assets being held by WNB in his or her accounts." *Id.* ¶ 76. Much like the retirement specialists in *Romano*, WNB induced its account holders to enter into the Custodian Agreements, which contemplated BLMIS' purchase and sale of securities with Plaintiffs' funds, and to continue the custodial relationship with WNB until Madoff's Ponzi scheme was revealed, by falsely assuring them that it was holding and safeguarding their assets from potential misfeasance by BLMIS.[6]

Plaintiffs also frame their allegations as a lawsuit against "a financial institution for failing its contractual obligation to safeguard a depositor's account holdings" as opposed to a lawsuit against an investment manager for securities fraud. Pls.' Mem.

6. Several other cases have held that a defendant's misrepresentations, which induced a plaintiff's investment of his assets in securities to his detriment, are in connection with the purchase or sale of securities. *See, e.g., Sofonia v. Principal Life Ins. Co.*, 465 F.3d 873, 877 (8th Cir.2006) (misrepresentations in a Policyholder Information Booklet, which induced policyholders to approve insurance company's demutualization process, were in connection with the purchase or sale of securities); *Instituto De Prevision Militar v. Merrill Lynch*, 546 F.3d 1340, 1349–50 (11th Cir. 2006) (a financial services firm's misrepresentations about its relationship with a pension fund, which induced plaintiffs to invest with the fund, were in connection with the pur-

chase or sale of securities because they facilitated the fund's post-investment theft of the investors' assets); *Cordova v. Lehman Bros., Inc.*, 413 F.Supp.2d 1309, 1319–20 (S.D.Fla. 2006) (investors' claims against the custodians and trustees of their funds, which alleged that the defendants misrepresented their relationship with a pension fund and the extent to which defendants would safeguard their assets, were preempted by SLUSA because the "allegations make clear that Plaintiffs were fraudulently *induced to purchase* the trusts/securities [from the pension fund] based on allegedly false assurances that their funds would be protected by Defendants") (emphasis in original).

at 9. The relationship between WNB and Plaintiffs, however, was not that of a traditional savings bank and its account holders. The Custodian Agreement makes clear that the purpose of the relationship between WNB and Plaintiffs was the investment of Plaintiffs' assets with BLMIS, which purported to buy and sell securities with Plaintiffs' funds. *See* SAC Ex. A, at 1 (authorizing WNB to transmit all funds to BLMIS for investment and noting that the account holder "ha[d] chosen BLMIS to receive and to invest [his] funds" and that BLMIS would "have full discretionary authority as to the manner in which funds are invested"). Much like the objective of the funds in *Beacon* and *Newman*, the objective of the Custodian Agreement was the management of Plaintiffs' assets using a strategy that contemplated the purchase and sale of covered securities. Even if this Court agreed with the holding in *Anwar*, the fact that it involved "multiple layers of separation between whatever phantom securities Madoff purported to be purchasing and the financial interests Plaintiffs actually purchased" is a crucial distinction from the allegations in this case. *Anwar*, 728 F.Supp.2d at 398. Here, the terms of the Custodian Agreements make clear not only that Plaintiffs knew that WNB was placing their assets with BLMIS for investment but that Plaintiffs "had chosen BLMIS to receive and to invest [their] funds, and ha[d] not relied on [WNB] in choosing to give BLMIS full discretionary authority." *Backus* SAC Ex. A, at 1. Although WNB had custodial and reporting obligations to Plaintiffs, it was essentially a pass-through entity for investment with BLMIS. WNB's misrepresentations, which "had the effect of facilitating Madoff's fraud," were in connection with the purchase or sale of securities. *In re Beacon Assocs. Litig.*, 745 F.Supp.2d at 430.

## C. "Covered Security" Element

■ Under SLUSA, a covered security is "a security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 18(b) of the Securities Act of 1933 ... at the time during which it is alleged that the misrepresentation, omission or manipulative or deceptive conduct occurred ..." 15 U.S.C. § 78bb(f)(5)(E). Under § 18(b) of the Securities Act of 1933, a covered security includes "a security issued an investment company that is registered, or that has filed a registration statement, under the Investment Act of 1940." 15 U.S.C. § 77r(b)(2). Plaintiffs argue that this element is not met because WNB's misrepresentations in the annual account statements concern WNB's investments in BLM 1 and BLM 2, which are not covered securities.

In *In re Beacon Assocs. Litig.*, 745 F.Supp.2d 386, however, the court rejected a similar argument. In that case, investors in a hedge fund, which in turn invested the fund's assets with Madoff, sued the fund after Madoff's fraud was uncovered. The investors argued that SLUSA did not preempt their claims because the fund's misrepresentations concerned their interests in the fund, which were not covered securities. The court rejected that argument, holding that "[a]lthough the shares of the Beacon Fund are not covered securities, the objective of the fund was to manage Plaintiffs' investment using a strategy that inevitably included the purchase and sale of covered securities." *Id.* at 430; *see also Newman*, 748 F.Supp.2d at 313 ("Although the shares of the [sub-feeder fund] are not covered securities, the objective of the [sub-feeder fund] was to manage Plaintiffs' investment using multiple strategies, including substantial investment in a 'large cap strategy' that explicitly involved the purchase or sale of covered securities.").

Here, as well, the relationship between Plaintiffs and their custodians, as delineated in the Custodian Agreements, was formed for the purpose of placing Plaintiffs' funds with BLMIS for investment in covered securities. WNB's misrepresentations, which concern the extent to which it was holding "securities or other assets in its possession as custodian of plaintiffs' retirement accounts," *Backus* SAC ¶ 61, as opposed to keeping those assets with BLMIS, concern an investment strategy that inevitably included the purchase or sale of covered securities.

In arguing that WNB's misrepresentations are not connected to covered securities, Plaintiffs cite *Pension Comm. of the Univ. of Montreal Pension Plan*, 750 F.Supp.2d 450, in which a group of hedge fund investors sued the funds' administrator after the funds filed for bankruptcy, claiming that the administrator had misled them by overvaluing the funds' shares. The court rejected the administrator's argument that SLUSA preempted the state law claims because a portion of the funds in question contained covered securities, holding that the "alleged fraud relates to those hedge funds rather than to the covered securities in the portfolios." *Id.* at 455. *Pension Comm.*, however, specifically found investments in hedge fund shares to be distinguishable from cases involving a plaintiff's deposit of money in a bank account managed by a trustee, who then makes misrepresentations concerning the trustee's use of the money to purchase, sell or hold covered securities. *Id.* at 455–56. The allegations here, which involve account holders who deposited their funds in individual custodial accounts and now allege that the custodian misrepresented the extent to which it was holding securities purchased by an investment manager with their funds, fits within the type of scenario *Pension Comm.* found distinguishable.

Moreover, the Second Circuit's decision in *Romano*, 609 F.3d at 524, which was decided after *Pension Comm.*, also makes clear that the misrepresentation need not be about covered securities so long as the purchase and sale of covered securities are an integral part of the misconduct complained of and the harm incurred. By misleading Plaintiffs into believing that it would safeguard their assets, WNB induced Plaintiffs to invest their assets with BLMIS, which purported to buy and sell covered securities with those assets but was in fact stealing them. BLMIS' buying and selling of covered securities is one of "a string of events that were all intertwined." *Id.*

### D. Misrepresentation or Omission Element

The last element required for SLUSA preemption is "an untrue statement or omission of a material fact." "The question under SLUSA is not whether the complaint uses the prohibited words: 'an untrue statement or omission of a material fact' or a 'manipulative or deceptive device or contrivance.' It is whether the complaint covers the prohibited theories, no matter what the words are used (or disclaimed) in explaining them." *Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305, 311 (6th Cir.2009). Plaintiffs concede that counts three through six—breach of fiduciary duty, violation of CUTPA, theft, and fraud—allege a misrepresentation or omission, but they argue that counts one and two, breach of contract and negligence, do not.

The same conduct—WNB's representations concerning its custody of Plaintiffs' investments, the value of said investments and WNB's custodial fees—underlie the breach of contract, negligence, and fraud-based causes of action. The only difference between the conduct alleged in the

breach of contract and negligence counts, on the one hand, and the fraud-based counts, on the other hand, is WNB's scienter; the fraud-based counts naturally allege that WNB acted fraudulently, whereas the breach of contract and negligence counts are silent as to WNB's state of mind.

■ Although the breach of contract and negligence counts do not explicitly allege that WNB acted fraudulently, this Court must determine whether fraud nevertheless is a necessary component of the claims. *Xpedior Creditor Trust v. Credit Suisse First Boston (USA), Inc.*, 341 F.Supp.2d 258, 266 (S.D.N.Y.2004) (holding that "a court must determine whether the state law claim relies on misstatements or omissions as a 'necessary component'" of the claim). "In this context, 'necessary component' encompasses both technical elements of a claim as well as factual allegations to the claims as alleged." *Backus I*, 2009 WL 5184360, at *10 (quoting *Xpedior Creditor Trust*, 341 F.Supp.2d at 266). When the gravaman of a complaint is a fraudulent or manipulative scheme, even if some of the counts do not explicitly allege fraud, those counts nevertheless rely on fraud as a necessary component of the claim for purposes of SLUSA preemption. *Xpedior Creditor Trust*, 341 F.Supp.2d at 268. *See also Daniels*, 743 F.Supp.2d 730 (holding that negligence claim was preempted by SLUSA because "[a]lthough not expressly stated in the Complaint, the conduct ... that underlies Plaintiffs' breach of contract claims also underlies Plaintiffs' negligence claims: an alleged corporate scheme" to invest the plaintiffs' assets in funds where defendants had a conflict of interest); *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F.Supp.2d 371, 443 (S.D.N.Y.2001) (holding that tortious interference of contract claim was preempted by SLUSA because plaintiffs

alleged elsewhere that defendants engaged in a fraudulent scheme and proof of the scheme was necessary to proving tortious interference with contract). Here, because the breach of contract and negligence counts are based on the same conduct as the fraud-based counts, fraud is a necessary component of those claims.

Each of the claims in the second amended complaint alleges a misrepresentation or omission of material fact in connection with the purchase or sale of a covered security. Therefore, all claims are preempted by SLUSA and are hereby dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendant CCB's Motion for Judgment on the Pleadings [Doc. Nos. 12, 29] are **granted,** and Plaintiffs' Motions to Remand [Doc. Nos. 20, 30] are **denied.** All of Plaintiffs' claims are dismissed and the case shall be closed.

SO ORDERED.